

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-25-2005

# USA v. Pelullo

Precedential or Non-Precedential: Precedential

Docket No. 02-2710

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Pelullo" (2005). *2005 Decisions*. Paper 1493.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1493

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 02-2710/2808/2957
_____

UNITED STATES OF AMERICA,
            Appellant at No. 02-2710

v.

LEONARD A. PELULLO,
            Cross-Appellant at No. 02-2808
_____

UNITED STATES OF AMERICA

v.

LEONARD A. PELULLO
            Appellant at No. 02-2957


_____


On Appeal from the United States District Court
for the District of New Jersey
(Crim. No. 94-276/Civ. No. 01-124)
District Judge: Honorable Dickinson R. Debevoise
_____

Argued: September 28, 2004

_____

Before: ROTH, BARRY and GARTH, <u>Circuit</u> <u>Judges</u>

(Opinion Filed: February 25, 2005)

_____

OPINION

_____

CHRISTOPHER J. CHRISTIE
United States Attorney
GEORGE S. LEONE
Chief, Appeals Division
970 Broad Street
Newark, New Jersey 07102-2535

NORMAN GROSS (Argued)
Assistant United States Attorney
United States Attorney's Office
Camden Federal Building and
United States Courthouse
P.O. Box 2098
Camden, New Jersey 08101-2098

   *Attorneys for Appellant/Cross-Appellee*
   *United States of America*

LAWRENCE S. LUSTBERG, Esq. (Argued)
THOMAS R. VALEN, Esq.

MARK A. BERMAN, Esq.
PHILIP JAMES DEGNAN, Esq.
Gibbons, Del Deo, Dolan, Griffinger
& Vecchione
A Professional Corporation
One Riverfront Plaza
Newark, New Jersey 07102

> *Attorneys for Appellee/Cross-Appellant*
> *Leonard A. Pelullo*

Garth, Circuit Judge:

Leonard A. Pelullo was indicted on December 9, 1994. He was convicted by a jury on November 8, 1996, following a six-week trial in the United States District Court for the District of New Jersey, of all 54 counts of the indictment, which charged conspiracy and substantive counts to embezzle funds belonging to an employee benefit plan and to launder the proceeds of that embezzlement. The District Court denied a host of post-trial motions, and imposed a prison sentence of 210 months for each of the money-laundering counts and 60 months for the conspiracy and embezzlement counts, to be served concurrently with the twenty-four year prison sentence previously imposed against Pelullo for prior racketeering and wire fraud convictions in the District Court for the Eastern District of Pennsylvania. The District Court also ordered Pelullo to make restitution in the amount of $898,688 and to forfeit $3,562,987 to the United States.

After the judgment in this case was affirmed by this

-3-

Court on direct appeal, 185 F.3d 863 (3d Cir. 1999) (table decision),[1] Pelullo filed a series of motions for a new trial pursuant to Federal Rule of Criminal Procedure 33. Pelullo essentially argued that the government failed to disclose exculpatory evidence at the time of trial, in violation of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), thus rendering his conviction constitutionally infirm. Additionally, Pelullo filed a motion for collateral relief pursuant to 28 U.S.C. § 2255, contending, *inter alia*, that the District Court failed to provide the jury with specific unanimity instructions in violation of his rights under the Sixth Amendment.

On May 17, 2002, after consolidating the new trial motions and the § 2255 motion, the District Court granted Pelullo a new trial, concluding that the government had in fact suppressed material information, in contravention of its *Brady* obligations. The District Court denied Pelullo's request for § 2255 relief, but granted a certificate of appealability with respect to one issue: whether the Court's failure to provide the jury with specific unanimity instructions violated Pelullo's Sixth Amendment rights.

The government has appealed from the grant of a new trial, and Pelullo has appealed from the denial of collateral

---

[1] The Supreme Court of the United States denied certiorari on January 10, 2000. *Pelullo v. United States*, 528 U.S. 1081 (2000).

relief.[2]

Because we conclude that the District Court erred in the threshold suppression determination prescribed by the *Brady* analysis, we will reverse the District Court's grant of a new trial. We also conclude that Pelullo's challenge to the jury instructions is procedurally barred by *United States v. Frady*, 456 U.S. 152, 167 (1982), and we will thus affirm the District Court's denial of his request for collateral relief. Accordingly, we will direct the District Court to reinstate the judgment of Pelullo's conviction and his sentence. In addition, we will remand to the District Court for resolution of the remaining issues raised by Pelullo in his § 2255 motion,[3] and direct that the District Court, as a priority matter, give serious consideration to vacating its Order of January 29, 2002, which had released Pelullo on bail.

I.

_____

[2] Pelullo also filed a Notice of Appeal on June 27, 2002 from the District Court's denial of his request for a new trial on the alternative ground that the government had breached his attorney-client privilege. However, he makes no argument to that effect in his briefs. Where, as here, an appellant fails to raise an issue in an appellate brief, even if it was listed in the Notice of Appeal, it is deemed waived. *See Ghana v. Holland*, 226 F.3d 175, 180 (3d Cir. 2000).

[3] *See infra* note 25.

Pelullo has been the subject of federal criminal prosecutions in the Eastern District of Pennsylvania, the Middle District of Florida, and the District of New Jersey.  He has, moreover, been persistent in challenging his various convictions, filing numerous notices of appeal with this Court from both the Pennsylvania and New Jersey prosecutions.[4]  In this appeal, however, which concerns only the New Jersey proceedings, it is the government that is appealing the District Court's grant of a new trial based on the government's purported failure to abide by its *Brady* obligations.  We are thus called upon to revisit the parameters of prosecutorial obligations under *Brady*.  In doing so, and for reasons which will later become apparent, we are

---

[4] *See, e.g., United States v. Pelullo*, 964 F.2d 193 (3d Cir. 1992) ("*Pelullo I*") (reversing all but one of Pelullo's wire fraud convictions in the Eastern District of Pennsylvania due to the erroneous admission of unauthenticated bank records); *United States v. Pelullo*, 14 F.3d 881 (3d Cir. 1994) (reversing all of Pelullo's convictions on the ground that it was error to use prior conviction upheld in *Pelullo I* as collateral estoppel to establish predicate offense in trial before second jury); *United States v. Pelullo*, 105 F.3d 117 (3d Cir. 1997) (reversing Pelullo's wire fraud and racketeering convictions by third jury based primarily on government's *Brady* violation in failing to disclose exculpatory evidence); *United States v. Pelullo*, 173 F.3d 131 (3d Cir. 1999) (affirming Pelullo's wire fraud and racketeering convictions after his fourth trial in the Eastern District of Pennsylvania); *United States v. Pelullo,* 185 F.3d 863 (affirming the convictions in this case).

mindful of the well-established principle that "the government is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself." *United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984) (citation omitted).

## II.

We have jurisdiction over the government's appeal under 18 U.S.C. § 3731 and Pelullo's appeal under 28 U.S.C. §§ 2253, 2255. Pelullo, however, raised a number of issues in his § 2255 motion for collateral relief, only one of which was certified by the District Court for interlocutory appeal under 28 U.S.C. § 1292(b). We granted Pelullo permission to appeal under § 1292(b), thereby establishing appellate jurisdiction only as to that one issue. We express no opinion as to the validity of Pelullo's remaining contentions, which will need to be addressed in the first instance by the District Court upon remand.

We ordinarily review a district court's ruling on a motion for a new trial on the basis of newly discovered evidence for abuse of discretion. *See, e.g.*, *Government of Virgin Islands v. Lima*, 774 F.2d 1245, 1250 (3d Cir. 1985). However, where, as here, the motion for a new trial is based on a *Brady* claim, which presents questions of law as well as questions of fact, we "will conduct a de novo review of the district court's conclusions of law as well as a 'clearly erroneous' review of any findings of fact." *United States v. Perdomo*, 929 F.2d 967, 969 (3d Cir. 1991) (citing *Carter v. Rafferty*, 826 F.2d 1299, 1306 (3d Cir. 1987)). Further, we exercise plenary review over the District

-7-

Court's denial of collateral relief. *United States v. Lloyd*, 188 F.3d 184, 186 (3d Cir. 1999).

## III.

A thorough review of the trial evidence is set forth in the District Court's opinion denying various post-trial claims submitted by Pelullo before his direct appeal in this case, and thus need not be recounted in detail here. *See United States v. Pelullo*, 961 F. Supp. 736, 744-50 (D.N.J. 1997), *aff'd*, 185 F.3d 863. As such, we begin our background discussion by only briefly recapitulating the salient facts of that factual summary so as to contextualize the *Brady* issues raised in this appeal.

Pelullo's indictment and subsequent conviction arose from the government's investigation of Pelullo's management of Compton Press, Inc. ("Compton Press"), the Compton Press, Inc. Retirement Plan, and the Compton Press, Inc. Thrift Plan (collectively, the "benefit plans"). At all relevant times, Pelullo controlled Compton Press and, concomitantly, the benefit plans. Through his long-time associate, David Hellhake, and a number of other employees and associates, Pelullo systematically diverted benefit plan assets for his own business and personal uses. Pelullo's *modus operandi* was to use a complex series of wire transfers, which can be classified in three principal sets of transactions.

### 1.

In the first of these transactions, Pelullo withdrew over $1.15 million from various brokerage accounts owned by the

benefit plans in order to finance an attempted corporate takeover of DWG Corp. (a holding company for Arby's and Royal Crown Cola), as well as to pay for certain personal expenses. He transferred that money to two separate accounts, hiding the true nature of the transactions from the plan Trustees. Pelullo transferred $750,000 to a corporate bank account of Granada Investments, Inc., the company Pelullo used to effect the contemplated takeover. Of these funds, some $70,000 were subsequently filtered into various accounts owned by Pelullo and his family members. Pelullo then transferred $400,000 to Paribas, an investment broker retained by Pelullo to handle the DWG takeover.

2.

The second set of transactions involved efforts to finance the purchase of Ambassador Travel, a bankrupt company, through a Pelullo-controlled entity called Away to Travel South ("ATTS"). Pelullo caused $1.326 million to be transferred from the benefit plans' brokerage accounts, with the bulk of funds going toward the purchase of Ambassador Travel. Much of the money remaining after the ATTS purchase eventually filtered down to Pelullo and his family. Pelullo accomplished this transaction by disguising the transfers as a loan to ATTS.

3.

The third set of transactions focused on the transfer of monies from an annuity contract, the assets of which belonged to the Compton Press, Inc. Retirement Plan. Pelullo, through his subordinates, terminated the contract. He then appropriated the

-9-

proceeds from the annuity, which totaled $1.4 million, to finance other acquisition projects and personal endeavors.

At issue in this appeal are documents obtained *after* trial from two distinct sources. The first set of documents was drawn from the hundreds of thousands of business records Pelullo had stored in a Miami warehouse (the "warehouse documents"). These documents had been seized by the FBI in connection with an investigation of Pelullo (unrelated to this case) in the Middle District of Florida ("MDFLA"). Pelullo's lawyers claimed to have received the documents from the United States Attorney's Office ("USAO") in the MDFLA after the completion of the trial in this case. Discovery had produced these documents in the criminal prosecution against Pelullo in Florida.

The second set of documents were generated in a civil lawsuit against Pelullo and others regarding Pelullo's defalcations from the Compton Press benefit plans. Under the Freedom of Information Act ("FOIA"), Pelullo had obtained the documents after the instant trial. He had obtained them from the Pension and Welfare Benefits Administration ("PWBA") of the United States Department of Labor ("DOL") ("PWBA documents").[5]

_____

[5] Pelullo also alleged that the government had suppressed other documents generated in two lawsuits against an attorney named Kenneth Falk and his law firm. The District Court, however, declined to address the *Brady* implications of these documents, after granting a new trial based on the suppression of the warehouse documents and the PWBA documents.

As we discuss later in this opinion, this case focuses on the threshold question of whether the government suppressed these documents within the meaning of *Brady* and its progeny. *See* discussion *infra* at 20-22. Without such suppression, there can be no *Brady* violation, notwithstanding the putative materiality of the subject documents. This suppression determination, moreover, is a highly factual inquiry, which requires us to carefully explore the relevant circumstances surrounding Pelullo's various prosecutions. We do so now, turning first to those events relevant to the warehouse documents.

IV.

A.

While the United States Attorney's Office in New Jersey was investigating the Compton Press matter, the USAO in the MDFLA was investigating allegations of bankruptcy fraud and other related offenses. In October of 1991, the FBI executed a search warrant for a 2400-square foot warehouse in Miami, which contained business records of twenty-five of Pelullo's companies. As Pelullo himself stated, the Florida warehouse included "[e]very document that [he] had generated in the last 20 years." *United States v. Pelullo*, 917 F. Supp. 1065, 1077 (D.N.J. 1995). These documents were in a "disorganized state and often mislabeled," with some of the boxes bearing numbers

Accordingly, these documents form no part of the present appeal.

-11-

but no further identification. *Id.* The FBI seized 904 boxes, 114 file cabinets, and 10 file cabinet drawers of corporate and financial records, transported them to a secure location in Jacksonville, Florida, identified and retained those documents relevant to the MDFLA investigation, and returned 75,000 pounds of warehouse documents to Pelullo in September of 1992. After returning the 75,000 pounds of documents to Pelullo, the Florida FBI agents retained roughly 160 boxes and 36 file cabinets of warehouse records.

In or around June of 1992, Kathleen O'Malley, an Assistant United States Attorney ("AUSA") from the MDFLA, wrote to one of Pelullo's lawyers, offering to transport the 75,000 pounds of released warehouse documents at the government's expense from Jacksonville to Miami (where Pelullo maintained his principal place of business), and to further transport those documents to Philadelphia (where Pelullo had been indicted) for approximately $8,000. AUSA O'Malley also sent the lawyers a partial index of all of the warehouse documents, though she admitted that the index was "obsolete," as it failed to show all of the items seized or indicate which of the listed items had been retained. Thereafter, the government delivered those 75,000 pounds of documents to Pelullo.

Also in 1992, AUSA O'Malley informed Pelullo's lawyers that the government would retain certain other documents that had been seized in the warehouse, but "would be willing to provide reasonable access to Mr. Pelullo's attorneys, and to permit counsel to copy some or all of the documents."

B.

During a three-day period in 1993, DOL Special Agent Rosario Ruffino (the principal investigator in the District of New Jersey case) and two other agents working on the Compton Press matter traveled to Jacksonville and conferred with the FBI agent in charge of the Florida investigation. Florida FBI agents assisted Agent Ruffino in identifying six boxes of documents from the retained warehouse documents that were relevant to the New Jersey investigation. At a Rule 104 evidentiary hearing[6] on May 16, 1995, Agent Ruffino testified that he had conducted only a cursory review of the warehouse files in Florida "to see if they were related to Compton Press and the profit sharing pension plans." Only after the six boxes of documents arrived in Newark did Agent Ruffino review them in more detail.

On December 22, 1994, AUSA Jose P. Sierra advised Pelullo that the government was making available for his inspection and discovery, pursuant to Federal Rule of Criminal Procedure 16,[7] "[m]iscellaneous documents obtained pursuant

---

[6] Federal Rule of Evidence 104(a) provides that "[p]reliminary questions concerning the qualification of a person to be a witness . . . or the admissibility of evidence shall be determined by the court."

[7] Federal Rule of Criminal Procedure 16 provides:

Upon a defendant's request, the government must permit the defendant to inspect and to copy or

to a search warrant executed on October 23, 1991," referring to the retained warehouse documents. The letter further stated: "[t]he United States is unaware of the existence of any material within the purview of *Brady v. Maryland.* If I later become aware of any other such material, I will promptly forward the same to you."

One week later, at a hearing on December 29, 1994, Pelullo acknowledged that he knew that the government possessed documents from the Florida warehouse, and that the warehouse documents included some documents involving Compton Press and the benefit plans. Pelullo asked that those documents be made available for his inspection, and represented that he would go to Jacksonville "if I have to, to take a look at those documents." In response, AUSA Sierra stated:

> photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>
> (i) the item is material to preparing the defense;
>
> (ii) the government intends to use the item in its case-in-chief at trial; or
>
> (iii) the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E).

As far as documents in Jacksonville . . . I do believe there was an investigation there and I believe documents are in Florida. If those documents are in the custody of the Assistant U.S. Attorney or the agents in Florida, I will talk to them, to see what documents bear on this case. They may not bear on this case, and I don't know, your Honor, if it is appropriate for Mr. Pelullo to use this case as a vehicle to go on a fishing expedition as to some other investigation which is currently going on in Florida. I can confer with the Assistant U.S. Attorney in Florida to be sure that that is the case. If she tells me that, in fact, the documents that are in Jacksonville bear on her investigation and do not bear on Compton, I would object and would ask the Court to advise Mr. Pelullo that . . . he is not entitled to those documents.

Pelullo responded that "there might be other items in those files that are relative to my case," and "[a]ll I want is the availability to see those files in Jacksonville to see what pertains to this case in my defense."

At this point, the District Court observed that "it would appear that there are documents related to this case in Florida," and suggested that the prosecutor "find out and if there are, make them available to the defendant[]." To this the government answered:

Again it is our position that, while I believe all

-15-

documents that were relevant in Florida we now
have and are available to Mr. Pelullo in this case.
If there are documents that we don't have that
bear on this case, and I doubt that there are, but I
will look into it, we'll make them available to Mr.
Pelullo.

The District Court then suggested that AUSA Sierra confer with
DOL Agent Ruffino, who was present in court. After doing so,
AUSA Sierra advised the court that Agent Ruffino intended "to
bring all relevant documents up [from Florida], so we believe
we have all of the relevant documents relevant to the Compton
case, here."

Despite these assurances, Pellulo insisted that, even
though the government had "culled" documents from the
warehouse that pertained to "[the government's] side of the
case," *he*, *Pelullo*, had to review all of the warehouse documents
to find those which pertained to the defense. AUSA Sierra
agreed that Pelullo was entitled access to any such documents,
provided that they did not bear on the Florida investigation. The
District Court directed the prosecutor to identify for Pelullo
those warehouse documents that the government would
voluntarily disclose, so that Pelullo could petition the Court if he
sought additional material. The prosecution assured Pelullo and
the Court that it had previously disclosed all *Brady* material of
which it was aware, and would disclose any additional *Brady*
material of which it subsequently became aware.

After January 27, 1995, Pelullo was incarcerated at FCI
Fairton, following his conviction in the Eastern District of

Pennsylvania. By letter dated February 28, 1995, Pelullo asked AUSA O'Malley to release "certain original documents seized" from the Miami warehouse in order to prepare for the trial in this case, and to provide him with an "inventory of all original documents seized" from the warehouse. In response, AUSA Mark Rufolo, one of the federal prosecutors in this case, informed Pelullo by letter dated March 2, 1995 that the six boxes of documents already provided to Pelullo "represent all of the documents obtained through the Florida search and seizure, *which we believe* may be relevant to the case pending in the District of New Jersey." Mr. Rufolo advised Pelullo, however, that he should make arrangements with the authorities in the MDFLA "[s]hould you desire to inspect or copy additional documents taken during the search."

By letter addressed to Edward Plaza, Esq., on March 14, 1995, in response to Pelullo's letter of February 28, 1995, AUSA O'Malley again offered "to have all of the documents in the FBI's possession copied, at Mr. Pelullo's expense." She also offered to obtain an estimate for that cost, and asked Mr. Plaza to advise her "what arrangements Mr. Pelullo would care to make concerning the photocopying charges."

At a hearing on March 28, 1995, Pelullo informed the District Court that, notwithstanding the government's position that the six boxes contained all relevant documents from the warehouse, *"that's not true as to my case. I'm the one that should determine what's relevant or what I'm going to need to defend myself."* Pelullo asked for a continuance of several months *"to get these documents, review them,"* and otherwise prepare for trial. He assured the District Court that he was

-17-

"prepared to tackle the task and defend myself as I have in the past." The District Court urged Pelullo, who at that time was *pro se*, to have his stand-by lawyer, Mr. Plaza, review the documents if Pelullo was unable to review them himself.

At that hearing, moreover, Mr. Rufolo reiterated the government's position that the warehouse documents were "not relevant to this case." However, Mr. Rufolo further stated:

> If Mr. Pelullo has an interest in viewing those documents, that he can make arrangement[s] with the Assistant U.S. Attorney in Jacksonville. She has responded by letter and indicated a willingness, similar to the arrangement I made, to have those documents copied if Mr. Pelullo agreed to pay for the documents.

In an April 27, 1995 letter to the District Court (with a copy to Mr. Rufolo), Pelullo assured the Court that "Mr. Plaza, Esquire is coordinating the efforts to obtain the documents currently held by Kathleen O'Malley, AUSA in Jacksonville, Florida."

In November 1995, a firm trial date of February 1996 was set at Pelullo's request. That date was subsequently adjourned until May 1996, also at Pelullo's request, for additional preparation time. In December 1995, Pelullo informed the District Court that he no longer wanted to proceed *pro se*, and persuaded the Court to elevate Mr. Plaza from stand-by counsel to full counsel.

Mr. Plaza then moved the Court to reschedule the trial from May 6, 1996 to September 1996. The Court conducted a hearing on that motion on March 25, 1996. At that hearing, Mr. Plaza explained that he needed a continuance in order to review the large volume of documents that were pertinent to this case, including the warehouse documents. Mr. Plaza acknowledged that not all of the more than 900 boxes originally seized from the Miami warehouse were relevant to this case, but adverted to the 58 boxes of documents that he had already received which contained relevant information.

Mr. Plaza further stated that he had "never in [his] professional life . . . come across a case with the number of documents that are involved as in this case . . ." Indeed, he noted that there were "thousands of documents which trace the funds allegedly embezzled from the two Compton Press, Inc. employee benefit plans." These documents, Mr. Plaza said, had "been seized during the course of a search of a warehouse containing many thousands of documents *placed there by Pelullo*." (emphasis added). In light of the multitudinous number of potentially relevant documents, Mr. Plaza urged the District Court to grant the continuance, stating that, "[t]he fact is I owe [Pelullo] a responsibility and I owe the Court a responsibility as well. You appointed me in this case, Judge, and I think you have to give me an opportunity to do the job which you appointed me to do."

Mr. Rufolo, in opposing Mr. Plaza's request for a continuance, informed the Court that members of the prosecution team in this case had examined "maybe a hundred" of the boxes in the warehouse and had brought back to Newark

"six boxes of documents" which the investigators "believe were at least important enough to bring here." Mr. Rufolo stated that most of those documents would not be offered into evidence by the government at trial. Mr. Rufolo also acknowledged that it was *"very difficult for me to predict exactly what Mr. Plaza needs."* (emphasis added).

"[W]ith utmost reluctance," and "against all [its] better judgment," the District Court granted Mr. Plaza's continuance request. The District Court also noted that the government's presentation, during the four-day Rule 104 hearing concerning the documentary evidence it intended to present at trial, "provided [Pelullo] with a preview of the government's case against him . . . [and provided Pelullo] in systematic form the bulk, if not all of the government's documentary evidence and the summaries based upon that evidence." The District Court granted another four month continuance in order to permit Mr. Plaza to find a proverbial "needle in a haystack someplace."

## C.

On September 10, 1996, only days before the adjourned trial began, Herbert Beigel, Esq., was substituted as Pelullo's counsel. As Mr. Beigel explained to the District Court in an affidavit dated March 23, 2000:

> I also had several conversations with Assistant United States Attorney Mark W. Rufolo concerning the government's production of favorable evidence. Mr. Rufolo advised me that the investigations and/or prosecutions of Mr.

-20-

Pelullo in the Eastern District of Pennsylvania and the Middle District of Florida were irrelevant to the case before the court in the District of New Jersey.

I told Mr. Rufolo that either I or someone from my law firm would go to Jacksonville to review the documents seized from Mr. Pelullo's warehouse. Mr. Rufolo responded that he had been assured by his agents and the Florida prosecutor that there were no documents in Jacksonville pertaining to Compton Press or the charges against Mr. Pelullo in this district and that I should not bother to go to Jacksonville.

Mr. Beigel further reported that just prior to the start of trial:

I had a conversation with Mr. Rufolo outside of the courtroom. I specifically asked Mr. Rufolo whether there was any favorable evidence available in the Middle District of Florida that had been seized in the search of Mr. Pelullo's warehouse. Mr. Rufolo responded that he had spoken to the prosecutor in the Middle District of Florida and had been told that the prosecutors in that district were not in possession of any documents relevant to Compton Press or the charges against Mr. Pelullo in this district.

The government did not contest Mr. Beigel's affidavit.

-21-

In a letter dated October 2, 1996, Mr. Beigel requested that AUSA Rufolo "confirm that the Government does not have any additional notes, FBI reports or other documents not already provided that would constitute *Brady* or *Giglio*[8] material regarding the witnesses the Government intends to call." By letter dated October 4, 1996, by which the government enclosed additional documents concerning its witnesses, Mr. Rufolo stated that the "United States is not aware of any additional *Jencks,*[9] *Giglio,* or *Brady* material."

D.

Following Pelullo's conviction on November 8, 1996 in the District of New Jersey, the Bankruptcy Court for the Eastern District of Pennsylvania, which presided over Pelullo's personal bankruptcy case, appointed Mr. Beigel as special counsel for Pelullo to represent him on the charges brought against him in the MDFLA. Later that month, Mr. Beigel spoke to AUSA O'Malley in the MDFLA "to make arrangements for access to documents in her possession in connection with the pending indictment against Mr. Pelullo in that district." The government agreed to grant Lyn Merritt, a paralegal who worked for Pelullo, access to the documents it kept in Jacksonville. Ms. Merritt subsequently discovered the "warehouse documents" at issue in

---

[8] *Giglio v. United States*, 405 U.S. 150 (1972) (material that would impeach a government witness).

[9] Jencks Act, 18 U.S.C. § 3500 (statements of any witness).

this appeal.

E.

While the United States Attorney's Office in New Jersey and agents from the Labor Racketeering Office of the DOL (which is responsible for enforcing violations of federal criminal law) were investigating Pelullo's actions with respect to the benefit plans, officials of the PWBA, a civil arm of the DOL, were monitoring a separate lawsuit, *Gerardi, et al. v. Pelullo, et al.*, United States District Court for the District of New Jersey, Civ. No. 89-4069. That case, like this one, involved the conversion of the benefit plans' assets. The PWBA collected documents which had been exchanged in discovery between Pelullo and the other litigants in that civil case.

On June 16, 2000, after Pelullo filed his motion for a new trial based on the Florida warehouse documents, the District Court ordered the government to produce documents held in its files at the DOL, which documents Pelullo had requested under the Freedom of Information Act. As we have indicated, certain of those documents are also at issue in this appeal.

As we noted earlier, the District Court on May 17, 2002 granted Pelullo a new trial, stating that the government had violated its *Brady* obligations. Prior to that time, on January 29, 2002, the District Court granted Pelullo's motion for release from confinement pending resolution of the various post-trial motions. Accordingly, since January 30, 2002, Pelullo has been released on bail, and remains in that status today. *See* Part VII *infra* (remanding for reconsideration of bail).

-23-

V.

In *Brady v. Maryland*, the Supreme Court held that due process forbids a prosecutor from suppressing "evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). To establish a due process violation under *Brady*, then, "a defendant must show that: (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material either to guilt or to punishment." *United States v. Dixon*, 132 F.3d 192, 199 (5th Cir. 1997) (citations omitted); *see also United States v. Higgs*, 713 F.2d 39, 42 (3d Cir. 1983).

Here, the District Court concluded that the government suppressed evidence from two distinct sources–(1) the Florida warehouse and (2) the PWBA's files at the DOL.[10] The District Court also concluded that the suppressed evidence was both

---

[10] The District Court did not reach the question whether the government suppressed evidence in the files of two civil actions against Kenneth Falk and his law firm. As we observed in note 5, *supra*, matters and documents having to do with the Kenneth Falk litigations are not before us on this appeal. We believe, however, that our holding, and the principles upon which it is based, have equal validity with respect to the documents from the Kenneth Falk litigations. Accordingly, we see no reason for the District Court to revisit this suppression issue.

-24-

favorable to Pelullo and material, thus establishing a "serious violation of the government's *Brady* obligations."[11] Although the government challenges both the suppression and materiality aspects of the District Court's decision, we only need reach the materiality issue upon concluding that either the warehouse documents or the PWBA documents were suppressed by the government within the meaning of *Brady*. Accordingly, we limit our discussion to a determination of whether *Brady* material was suppressed by the government. As we have stated earlier–we hold that it was not.

A.

At the outset, our analysis is informed by certain pragmatic considerations. We are especially mindful of the massive amounts of documents involved in this case and the concomitant practical difficulty faced by the government in discovering and revealing all *Brady*-type material. We can express the reality of the situation no better than the District Court had done in denying Pelullo's previous *Brady* claims based on the non-disclosure of certain other documents:

---

[11] The District Court did not address or rule upon the materiality of numerous documents discussed in Pelullo's motion and briefed by the parties. While observing that the government had suppressed these items, the Court explained that it was "unnecessary to describe them all in this opinion because the failure to have produced [the 24 items] described [in its Opinion and Order] is sufficient to require the granting of the motion for a new trial."

Pelullo's method of operation was to conduct his multitudinous business and personal transactions through a host of corporate and partnership entities and through a dizzying succession of wire transfers, both necessary and unnecessary to accomplish an objective. As a result Pelullo was able to conceal the nature of his undertakings and deceive those with whom he was dealing, not only the Employees Benefit Plans which are the subject of this case, but also others who did business with him. All of this activity generated mountains of documents, as disclosed by the search of the Miami warehouse. *No one but Pelullo could comprehend it all in its entirety. He alone, an obviously highly intelligent person, was able to keep track of it all and manipulate it to his advantage.*

* * * *

One of the problems in this case is the almost inexhaustible body of materials which relates to it. There is the mountain of records which Pelullo and his companies generated and which is described above . . . . As a practical matter no one, either prosecutor or defense counsel, can ever expect to get all of this material under control. There will always be something more which can arguably be relevant to the issues in this case.

*Pelullo,* 961 F. Supp. at 750-53 (emphasis added). As the District Court thus recognized,[12] the sheer volume of documents

[12] On September 10, 2003, this Court remanded the case to the District Court for consideration of Pelullo's motion to expand the record to include documents that he supposedly first received in response to applications under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"). Following its review of the FOIA documents, the District Court, in a thorough opinion dated January 7, 2004, denied Pelullo's motion. The District Court observed that:

> defendant's career has consisted of engineering one fraudulent transaction after another, looting one company after another, deceiving one individual or corporation after another, of which Compton Press was only the most recent; during the course of these activities defendant has generated tens of thousands of documents designed to facilitate his fraudulent conduct and has involved countless individuals in his schemes, some innocent victims and some knowing participants; leaving in his wake his many victims; defendant's activities have generated many criminal and civil investigations, each [of] which generated its own mountain of documents; no prosecutor could possibly keep track of the array of documents generated during the course of the many investigations of defendant . . . .

interspersed through many jurisdictions, many of which could be relevant to any or all the various prosecutions, seriously weakens any claim that the government suppressed evidence. This holds true for both the warehouse documents and the PWBA documents. As Pelullo himself had admitted when seeking a trial continuance, "I'm the one that should determine

The District Court concluded that this Court's intervening decision in *United States v. Merlino*, 349 F.3d 144 (3d Cir. 2003), may have raised the question whether, in its opinion granting Pelullo a new trial on *Brady* grounds, it had imposed an unreasonable burden on the government. Interestingly, the District Court had:

> considered granting the motion [to supplement the record], not because [the FOIA documents] support defendant's motion for a new trial on *Brady* grounds, but because they might provide grounds for excusing any *Brady* violations which have been found to have taken place . . . It would be a strange outcome if a defendant whose many fraudulent schemes created a number of mountainous piles of documents in several jurisdictions, could escape conviction because, as a practical matter, no United States Attorney's Office prosecuting one of the frauds could put its hands on every single possibly relevant document.

*United States v. Pelullo*, Crim. No. 94-276, Civ. No. 01-124, Supplemental Appx. SA2 at 4, 17, 24 (D.N.J. Jan. 7, 2004).

-28-

what's relevant or what I'm going to need to defend myself."

B.

We proceed to examine the purported suppression of the warehouse documents. Our analysis focuses on three overarching considerations: (1) the respective knowledge of the parties; (2) Pelullo's access to the warehouse documents; and (3) the government's representations. We address each of these factors *seriatim*.

1.

There is no dispute here that Pelullo had knowledge of the existence of the warehouse documents. As we previously indicated, these were Pelullo's *own* documents, generated during a twenty-year span involving virtually all of Pelullo's myriad companies and business ventures. Pelullo was well-aware that the warehouse documents were in Florida, and that members of the New Jersey prosecution team in this case did not actually possess those documents. Additionally, Pelullo received 75,000 pounds of the warehouse documents long before trial, thereby providing him with additional insight about what he could expect to find from a thorough review of the documents that the government had retained. This, therefore, is not a situation where the government failed to disclose documents unknown to the defense, about which the government had superior

-29-

knowledge.[13]

What is more, there is no indication that the government had knowledge about the exculpatory nature of the warehouse documents, which distances this case from *Banks v. Dretke*, 124 S.Ct. 1256 (2004) and *Strickler v. Greene*, 527 U.S. 263 (1999). In both these cases, which are heavily relied upon by Pelullo, the prosecution team had actual knowledge during trial of information that contradicted the trial testimony of crucial prosecution witnesses. *Banks*, 124 S.Ct. at 1264-65, 1273-74; *Strickler*, 527 U.S. at 273-74. Also in both cases, the prosecution had represented to the defense that it had provided access to all information possessed by the prosecution, knowing that the files that were made available to the defense did not contain the crucial impeachment information. *Banks*, 124 S.Ct. at 1273; *Strickler*, 527 U.S. at 276, 282. Unlike the state court prosecutors in *Banks* and *Strickler*, here, the government was

---

[13] *See United States v. Dixon*, 132 F.3d at 199 (government did not suppress appellant's financial records, which the government seized while executing a search warrant, because information about appellant's own finances was known or "should have been known" to him through exercise of due diligence); *United States v. Aubin*, 87 F.3d 141, 148 (5th Cir. 1996) (government did not suppress information regarding loans for which appellant or companies he controlled was borrower, since "this is information about which [appellant] should have known [through the exercise of due diligence]").

unaware of any material information in those documents.[14] *See United States v. Joseph*, 996 F.2d 36, 39 (3d Cir. 1993) (noting that the more difficult *Brady* situation is where certain exculpatory evidence is available to the prosecution but not within its actual knowledge).

## 2.

A further consideration here, which is perhaps of even greater import, is that the government repeatedly made the warehouse documents available to Pelullo and his attorneys for inspection and copying.[15] *Brady* and its progeny permit the

---

[14] The District Court stated that it found "no evidence that the government knowingly used false evidence."

[15] Pelullo asserts that the government knew that he could not afford to pay the expenses for the warehouse documents. He thus argues that offering to provide an incarcerated and impecunious defendant with copies of thousands of documents at his expense hardly satisfies the government's *Brady* obligations. This argument is wholly unpersuasive. As the government points out, Pelullo could have sought reimbursement under the Criminal Justice Act for the expenses of obtaining the documents. *See United States v. Feldman*, 788 F.2d 625, 626 (9th Cir. 1986). In addition, Pelullo never informed the government or the District Court that he could not obtain the documents due to financial constraints, thus rendering this argument on appeal unavailable. In any event, his putative financial inability to obtain copies of the warehouse documents

-31-

government to make information within its control available for inspection by the defense, and impose no additional duty on the prosecution team members to ferret out any potentially defense-favorable information from materials that are so disclosed. *See United States v. Mhahat*, 106 F.3d 89, 94 (5th Cir. 1997) (where government gave defense access to 500,000 pages of documents, no obligation arose under *Brady* to "point the defense to specific documents within a larger mass of material that it has already turned over"); *United States v. Parks*, 100 F.3d 1300, 1307 (7th Cir. 1996) ("*Brady* [does not] require[] the Government to carry the burden of transcribing [65 hours of intercepted conversations]" because the defendants "had been given the same opportunity as the government to discover the identified documents" and "information the defendants seek is available to them through the exercise of reasonable diligence") (internal quotations and citation omitted); *see also United States v. Mulderig*, 120 F.3d 534, 541 (5th Cir. 1997).

As in *Mmahat* and *Parks*, the government in this case made the warehouse documents available to the defense, without specifying any particular documents that were helpful to the defense, something *Brady* does not obligate it to do. In such circumstances, the burden is on the defendant to exercise

does not explain why he (or his attorney) did not accept the government's alternative offer in making the documents available for an on-site inspection.

reasonable diligence.[16]

3.

Conceptually, we find ourselves at the intersection between two particular branches of the *Brady* doctrine. Our jurisprudence has made clear that *Brady* does not compel the government "'to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself.'" *Starusko*, 729 F.2d at 262 (quoting *United States v. Campagnuolo*, 592 F.2d 852, 861 (5th Cir. 1979)); *see also United States v. Dansker*, 565 F.2d 1262, 1265 (3d Cir. 1977). It is equally clear, however, that defense counsel's knowledge of, and access to, evidence may be effectively nullified when a prosecutor misleads the defense into believing the evidence will not be favorable to the defendant. *See, e.g., United States v. Shaffer,* 789 F.2d 682, 690 (9th Cir. 1986) (finding suppression where government appraised defense counsel of the existence of certain tapes but also stated that those tapes would be of "no value"); *Hughes v. Hopper*, 629 F.2d 1036, 1039 (5th Cir. 1980). At issue, then, is whether the representations made by the various govnernment attorneys compel a finding of

---

[16] It bears repeating that the government had returned 75,000 pounds of documents to Pelullo. These documents were in his possession throughout the relevant time period. Pelullo's *Brady* argument pertains instead to the roughly 160 boxes and 36 file cabinets of warehouse records which were retained by the government, but which were available to Pelullo for his inspection.

suppression, where every other pertinent consideration–*i.e.*, (1) the mountainous piles of documents, which belonged to Pelullo, (2) the government's lack of specific knowledge about the existence of favorable, material evidence, and (3) defendant's extended access to, and purported knowledge of, particular documents–weighs against such a finding.

Pelullo argues that the *Brady* doctrine is premised upon the appropriateness of the court and defense counsel relying upon the government's representations. The difficulty with Pelullo's argument is that there does not appear to be any such reliance in this case, notwithstanding the government's (in many instances, equivocal) assurances. With respect to the pre-1996 representations, the record establishes that neither Pelullo nor Mr. Plaza relied on the government's statements that the warehouse documents contained no relevant documents. To the contrary, while acting *pro se*, Pelullo emphasized that:

> [t]hey have taken the position that they have six boxes of material and that is all that's relevant to the case. That may be true as to their case, but that's not true as to my case. I'm the one that should determine what's relevant or what I'm going to need to defend myself.

At that time, Pelullo also asked for a continuance of several months "to get [the warehouse documents], review them," and otherwise prepare for trial. That was Pelullo's position for the twelve months between December 1994 and December 1995 while he was proceeding *pro se*, with Mr. Plaza serving as stand-by counsel.

During this relevant time span, the government's last representation occurred in March 28, 1995, when Mr. Rufolo reiterated the government's position that the warehouse documents were "not relevant to this case." This representation, however, was followed by an April 27, 1995 letter from Pelullo to the District Court requesting a continuance to obtain and review documents. Pelullo assured the court that "Mr. Plaza, Esquire is coordinating the efforts to obtain the documents currently held by Kathleen O'Malley, AUSA in Jacksonville, Florida." It follows that any assurances by the government occurring before this April 27, 1995 letter could not have induced reliance by Pelullo.

In addition, after Mr. Plaza was elevated from stand-by to full counsel in December 1995, he made it clear that he was not relying upon the six boxes of documents produced by the government. Given Mr. Plaza's successful request to further delay the trial in order to permit him to review the multitudinous documents possibly relevant to this case, including the warehouse documents, any claim of reliance based on any prior representations by the government must be rejected as fanciful.[17]

---

[17] Pelullo argues that the transcript does not support the government's position that Mr. Plaza indicated that he would go to Florida to review the warehouse documents. Rather, according to Pelullo, it shows that Mr. Plaza intended to review 18 boxes of documents that had already been provided to him by the government, more than forty boxes that were already in Mr. Plaza's possession and which Mr. Pelullo had culled from the 75,000 pounds of documents returned after the warehouse

The District Court's finding to the contrary is contradicted by the record, and must be held to be clearly erroneous. However, this does not end the inquiry.

Pelullo also relies on certain post-1996 statements by the government. Mr. Plaza represented Pelullo from December 1995 until the eve of trial in September of 1996, when Pelullo convinced the District Court to replace him with Mr. Beigel as court-appointed counsel, with the assurance that the appointment of Mr. Beigel would not delay the trial. Even after Mr. Beigel was appointed, Pelullo retained the services of Mr. Plaza, whom the District Court directed to "remain as co-counsel for as long as Pelullo and Mr. Beigel thought he could be helpful." *Pelullo*, 961 F. Supp. at 760. Pelullo has submitted an affidavit from Beigel, alleging that he relied upon certain representations by the government that no additional *Brady* material existed in Jacksonville. As we have indicated, the government has not contested this affidavit.

However, a more careful look reveals that, as a practical matter, there could not be any genuine reliance by Pelullo on the government's statements, as there was no realistic opportunity for Mr. Beigel to review the warehouse documents during the two-week window Pelullo had left him to prepare for trial. In

search, and various documents he hoped to obtain from third parties. Whether or not Mr. Plaza intended to review the warehouse documents in particular, given the history of the parties' correspondence about the warehouse documents, Pelullo's contention is neither persuasive nor convincing.

-36-

any event, all this merely begs the question why Pelullo and Plaza failed to review the warehouse documents during the twenty-one month span between December 1994, when Pelullo was indicted, and September 1996, when the trial began, as they repeatedly assured the District Court and the government that they would.

As the government argues, it was the twenty-one months of defense inactivity and the two-week window that Pelullo had left Mr. Beigel to prepare for trial, not any statements by the prosecution, that prevented the defense from examining the warehouse documents. The fact of the matter is that the government's post-1996 representations did not eliminate its previous offers to make the warehouse documents available to the defense, and in no way absolved the defense of its failure to exercise due diligence during the many months between indictment and trial.

We find the reasoning in two cases from the Seventh and Fifth Circuits instructive here. First, in *United States v. Senn*, 129 F.3d 886 (7th Cir. 1997), the Seventh Circuit held that the failure to disclose the government key witness's entire criminal record was not a *Brady* violation, notwithstanding the defense team's alleged reliance on that disclosure as complete, where defense counsel had reason to know that the government's disclosure was not exhaustive. *Id.* at 893. The Court also noted that the ease with which the defense eventually obtained the file in question defeated their claim of suppression. *Id.* at 892-93.

In this case, too, the ease with which Pelullo discovered the relevant warehouse documents after trial would seem to

defeat any claim of suppression, to say nothing with respect to his purported knowledge of the documents and their contents. Furthermore, Pelullo had reason to know, as did the defense in *Senn*, and as he more than once stated, that the government's disclosure (*i.e.*, the six boxes of warehouse documents) was not exhaustive as to his side of the case.

Second, in *United States v. Mulderig*, 120 F.3d 534, the government gave the defense access to 500,000 pages of documents relating to the case. *Id.* at 541. Among the documents were two board resolutions that purportedly gave the officers the authority to negotiate and approve the loans for which they were prosecuted. The defense argued that the government violated *Brady* by (1) failing to designate two allegedly exculpatory resolutions; (2) affirmatively misrepresenting the resolutions; and (3) failing to correct false testimony as to the authority of the officers to negotiate the final terms of the loans. *Id.* The Fifth Circuit rejected the *Brady* claim, noting that Mulderig "could not have been unaware of the alleged existence of the resolutions." *Id.*[18] The Court thus concluded that "the nondiscovery of the resolutions was due to

[18] *See also Mmahat*, 106 F.3d at 94-95 (same); *United States v. Runyan*, 290 F.3d 223, 245-46 (5th Cir. 2002) (where government afforded the defense full access to hard drive of seized computer, the government, in not identifying information helpful to the defense contained in the hard drive, did not suppress that information, as *Brady* does not require "the Government, rather than the defense, to turn on the computer and examine the images contained therein").

Mulderig's lack of diligence rather than any affirmative government misbehavior." *Id.*

Both cases–*Senn* and *Mulderig*–stand for the proposition that defense knowledge of, or access to, purportedly exculpatory material is potentially fatal to a *Brady* claim, even where there might be some showing of governmental impropriety. Like the defendants in *Senn* and *Mulderig*, Pelullo had sufficient access to the information at issue, notwithstanding any statements of the government, which in any event were either discounted by the defense or were made so close to trial as to have no practical import.[19]

---

[19] Pelullo's attempts to distinguish *Senn* and *Mulderig* are unpersuasive. He argues, for instance, that in *Senn* the government had "a month before trial . . . informed the defendants that it had not contacted all local police departments, that the defendants should do so themselves, and that the discovery materials it had were extensive but not exhaustive." 129 F.3d at 892. Pelullo thus appears to ignore his own statements in this case, supported by the reality of the situation, *that only he could decipher the importance of the warehouse documents to his side of the case.* More importantly, the warehouse documents belonged to Pelullo, which renders the governmental conduct in this case even less blameworthy than that of the government in *Senn*.

Pelullo attempts to distinguish *Mulderig* by arguing that the prosecution there produced the documents in question, in contrast to this case, where the prosecution concealed them in

In sum, the following factors militate against a finding of suppression of the warehouse documents: (1) the massive amount of documents, which belonged to Pelullo; (2) the government's lack of knowledge as to the exculpatory nature of the material contained in the warehouse documents; (3) the defense knowledge of, and access to, the subject documents. The government's representations–the only factor weighing in favor of suppression–do not, under the circumstances, negate Pelullo's duty to exercise reasonable diligence.

We hold that the District Court clearly erred in its findings of fact and that there was no suppression of the warehouse documents.

## C.

The District Court also found that the government suppressed the PWBA documents, on the ground that the government's *Brady* obligations extended to the content of those

the Florida warehouse. This argument entirely misses the critical distinguishing fact between the two cases–the government in *Mulderig* had specific knowledge about the location and exculpatory nature of the board resolutions but nonetheless failed to designate the resolutions as exculpatory in response to a *Brady* request. Because the government in this case *had no knowledge of the exculpatory material contained in the warehouse documents,* its affirmative representations are far less susceptible of reliance than the governmental silence found insufficient to support a *Brady* violation in *Mulderig*.

files because "this material was in the files of the same agency, the DOL, that prepared the present case for trial." Because we reject the District Court's conclusion that the PWBA should be considered part of the "prosecution team," we conclude the government did not suppress the PWBA documents.

*Brady* places an affirmative obligation on prosecutors "to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). That said, *"Kyles* cannot 'be read as imposing a duty on the prosecutor's office to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue.'" *United States v. Merlino*, 349 F.3d 144, 154 (3d Cir. 2003) (quoting *United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir. 1996) and citing *United States v. Locascio*, 6 F.3d 924, 949-50 (2d Cir. 1993)). Here, there is no question that certain DOL agents were integral members of the prosecution team. Pelullo argues that this compels the conclusion that the PWBA (as part of the DOL) was part of the prosecution team as well, thus extending the government's *Brady* obligations to information possessed by the PWBA. The government argues that the prosecution team should not be defined to include the entire DOL, a massive federal agency. The question presented, then, is whether the PWBA officials who possessed the documents at issue were members of the "prosecution team" in this case.[20]

---

[20] Stated somewhat differently, the question is whether the prosecution should be charged with "constructive knowledge" of the evidence held by the PWBA. *See United*

-41-

We addressed an analogous situation on direct appeal in this very case. There, Pelullo contended that the government took an inconsistent position in a forfeiture proceeding in the Eastern District of Pennsylvania that was being held during Pelullo's criminal trial in New Jersey. In an unpublished opinion, we rejected Pelullo's *Brady* claim based on the foregoing, stating that there was no indication that the government affirmatively withheld the materials, as there was nothing to suggest that the New Jersey prosecutors were even aware of the Eastern District of Pennsylvania prosecutors' litigating position in the forfeiture proceeding. *See United States v. Pelullo*, 185 F.3d 863 (affirming Pelullo's judgment of conviction and sentence). We went on to hold that because the "government is not under an obligation to obtain and disclose all information in the possession of other arms of the government that are not involved in the particular prosecution," the prosecution was under no obligation to "ferret out evidence from another pending proceeding with a tenuous connection to the prosecution." *Id.*

Similarly, in *Merlino*, the prosecution, pursuant to defendants' request, served the Bureau of Prisons ("BOP") with a series of subpoenas, directing it to preserve and make copies of all tape-recorded conversations of certain government witnesses. 349 F.3d at 153. Subsequently, the BOP forwarded

---

*States v. Perdomo*, 929 F.2d 967, 970 (3d Cir. 1991) (holding that "the prosecution is obligated to produce certain evidence actually or constructively in its possession or accessible to it").

to the government roughly 300 tapes, which the government listened to, concluding that they contained no *Brady* material. *Id.* At issue in the case was whether the government was obligated under *Brady* to review over 2,000 additional tapes held by the BOP. These tapes were never produced to, or listened to, by any member of the prosecution team. *Id.* This Court concluded that, in light of the government's representation that none of the tapes it had reviewed contained *Brady* material, the defense requests would have sent the prosecution on an "open-ended fishing expedition." *Id.* at 154 (citation omitted).

Our conclusion here is further supported by the Second Circuit's decision in *United States v. Locascio*, which this Court cited with approval in *Merlino* and on direct appeal in this case. In *Locascio*, the Second Circuit held that the government did not suppress impeaching information about a government witness in an organized crime prosecution in which the FBI was the lead investigatory agency. The impeaching information was memorialized in a report prepared by FBI agents who were not members of the *Locascio* prosecution team, but who were investigating other organized criminal activity involving the same witness. 6 F.3d at 949-50; *see also United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) ("[T]he imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt a 'monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'") (citation omitted); *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (refusing to impute

knowledge of Florida prosecutor to an AUSA in New York).[21]

Applying the general principle set forth in these cases–that the prosecution is only obligated to disclose information known to others acting on the government's behalf in a particular case–we conclude that the PWBA was not a

[21] In a similar vein, the Eleventh Circuit has held that the scope of a prosecutor's authority properly defines the scope of the prosecutor's disclosure obligations. Thus, in *United States v. Meros*, 866 F.2d 1304 (11th Cir. 1989), the Court of Appeals held that a prosecutor in the Middle District of Florida did not "possess" favorable information known by prosecutors in the Northern District of Georgia and the Eastern District of Pennsylvania. *Id.* at 1309. The Court stated, "[a] prosecutor has no duty to undertake a fishing expedition in other jurisdictions in an effort to find potentially impeaching evidence every time a criminal defendant makes a *Brady* request for information regarding a government witness. *Id.* Similarly, in *Moon v. Head*, 285 F.3d 1301 (11th Cir. 2002), the defendant based his *Brady* claim on certain evidence made available to him post trial regarding his alleged murder conviction. One of the State's witnesses at the sentencing phase–an agent with the Tennessee Bureau of Investigation ("TBI")– failed to reveal certain key pieces of information about the killing. The Court of Appeals, in denying the *Brady* claim, refused to impute to the Georgia prosecutor the evidence possessed by the TBI, as the Georgia and Tennessee agencies shared no resources or labor and the TBI agents were not under the direction or supervision of the Georgia officials. *Id.* at 1310.

member of the prosecution team. There is no indication that the prosecution and PWBA engaged in a joint investigation or otherwise shared labor and resources. *Cf. United States v. Antone*, 603 F.2d 566, 569-70 (5th Cir. 1979) (holding that information possessed by state investigator should be imputed to federal prosecutor because "the two governments, state and federal, pooled their investigative energies [to prosecute the defendants]"). Nor is there any indication that the prosecution had any sort of control over the PWBA officials who were collecting documents. And Pelullo's arguments to the contrary notwithstanding, that other agents in the DOL participated in this investigation does not mean that the entire DOL is properly considered part of the prosecution team. Indeed, in *Locascio*, information was not attributable to the prosecution team, even though it was known to investigators drawn from the same agency as members of the prosecution team.[22] Likewise here,

---

[22] In *United States v. Wood*, 57 F.3d 733 (9th Cir. 1995), relied on by Pelullo, the Ninth Circuit held "only that under *Brady* the agency charged with administration of the statute, which has consulted with the prosecutor in the steps leading to prosecution, is to be considered as part of the prosecution in determining what information must be made available to the defendant charged with violation of the statute." *Id.* at 737; *see also United States v. Bhutani*, 175 F.3d 572, 577 (7th Cir. 1999) (same). Both courts found the FDA part of the prosecution team because it was the "agency interested in the prosecution." 57 F.3d at 737; *see also* 175 F.3d at 577. Here, by contrast, there is nothing to suggest that the civil PWBA investigators had a similar level of involvement in the criminal prosecution, and

-45-

the PWBA civil investigators who possessed the documents at issue played no role in this criminal case.[23]

_____

thus the limited holdings of *Wood* and *Bhutani,* do not apply.

[23] Because the PWBA was not a part of the prosecution team, the prosecution never had "constructive possession" of the *Brady* materials. In *United States v. Joseph*, we construed "constructive possession" to mean "that although a prosecutor has no actual knowledge, he should nevertheless have known that the material at issue was in existence." 996 F.2d at 39. We there held that "where a prosecutor has no actual knowledge or cause to know of the existence of *Brady* material in a file unrelated to the case under prosecution, a defendant, in order to trigger an examination of such unrelated files, must make a specific request for that information." *Id.* at 41. Here, there is no dispute that Pelullo never made a specific request for the PWBA documents, making this case somewhat similar to *Joseph*. But whereas *Joseph* concerned "unrelated" files, this case arguably involves related files. While that distinction certainly distances this case from *Joseph*, it does not compel the conclusion (advanced by Pelullo) that *Joseph* has no bearing on this case. *Joseph* concerned a prosecutor's duty to search his *own* unrelated files for exculpatory material. This case concerns a prosecutor's duty to search related files maintained by different offices or branches of the government. Given that the PWBA was not a member of the prosecution team, it would be accurate to say that the prosecution never had "constructive possession" of the PWBA documents.

-46-

We hold that the government did not suppress the PWBA documents and that to the extent that findings of the District Court were at issue, such findings were clearly erroneous.[24]

## D.

For the foregoing reasons, we hold that the District Court erred in concluding that the government suppressed the warehouse and PWBA documents. We therefore need not determine whether that information is favorable to the defense and material, or whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)) (internal quotations omitted).

## VI.

Lastly, we consider Pelullo's appeal from the denial of

---

[24] We note that, even if the prosecution is charged with knowledge, either actual or constructive, of the PWBA documents, Pelullo's *Brady* claim would still fail if he could have obtained the information through the exercise of reasonable diligence. While the public nature of these documents, generated as they were during the course of two civil actions, suggests that Pelullo had sufficient access to the documents to defeat his *Brady* claim, we need not reach that issue in light of our holding here.

collateral relief.[25]  We must decide whether the "cause and actual prejudice" test articulated by the Supreme Court in *United States v. Frady*, 456 U.S. 152 (1982), should apply to this appeal, thus procedurally barring Pelullo's collateral challenge to the jury instructions.

---

[25] Pelullo filed a motion under 28 U.S.C. § 2255 advancing four grounds to vacate, set aside or correct his sentence, namely: (1) the court failed to provide the jury with specific jury unanimity instructions in violation of his Sixth Amendment rights; (2) the court misapplied the sentencing guidelines in that it sentenced defendant pursuant to U.S.S.G. § 2S1.1, which is applicable to money laundering, whereas it should have sentenced him pursuant to the embezzlement guideline, which would have produced a shorter sentence; (3) the court improperly amended defendant's judgment of conviction to include forfeiture provisions; and (4) the government failed to present sufficient evidence to support the convictions for money laundering.

After noting that the second and third grounds could be dealt with later if defendant is convicted after a new trial and that the fourth ground was already addressed and rejected on defendant's motion for a judgment of acquittal, the District Court determined that the first ground, while presenting serious questions, should be rejected pursuant to *United States v. Frady*, 456 U.S. 152, 167 (1982).  The District Court thus dismissed the petition, though it granted a certificate of appealability with respect to the jury instruction issue.  As we have stated, this appeal is thus limited to that one issue.

-48-

A.

Count 1 of the indictment charged a two-part conspiracy to embezzle funds and to engage in money laundering. The jury charge relating to Count 1 did not require that there be unanimity either as to the object of the conspiracy or as to the particular schemes alleged.[26] Counts 2-12 charged embezzlement, and Counts 13-54 charged money laundering. Each of those counts incorporated Count 1 by reference. Further, the jury charge applicable to the embezzlement offenses did not require unanimity as to whether Pelullo engaged in a) embezzling, b) stealing, c) abstracting, or d) converting pension funds.[27] The charge applicable to the money laundering counts

---

[26] With respect to Count 1, the District Court charged:

Count I lists two offenses as the object of the Section 371 conspiracy–theft or embezzlement of the Compton Press pension funds and money laundering. You need not find that the defendant conspired to commit both of these offenses to find the defendant guilty of the conspiracy charged in Count 1. In order to find the defendant guilty of Count 1, you must, however, unanimously agree that the defendant conspired to commit at least one of the offenses charged as an object of the conspiracy.

[27] The charge relating to the embezzlement counts stated:

-49-

did not require unanimity as to whether Pelullo engaged in the financial transaction a) with the intent to promote the carrying on of the specified unlawful activity or b) with knowledge that the financial transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity.[28]

---

As you can see, the statutory language of Section 664 . . . covers a number of different sorts of takings. However, the United States is not required to prove all four means, which I have just defined for you, were actually employed by the defendant. Rather, the government's proof need only establish beyond a reasonable doubt that the defendant unlawfully and willfully either embezzled, or stole, or abstracted, or converted to his own use or the use of another the money or property of the Compton Press Employees' Profit Sharing Retirement Plan or the Compton Press Employees' Thrift Plan, as charged in the indictment.

[28] The charge relating to the laundering counts stated:

[T]o find the defendant guilty of money laundering, you must find that the government has proven . . . beyond a reasonable doubt, [among other things], [t]hat the defendant engaged in the financial transaction with either the intent to

In his § 2255 motion, Pelullo argued that the District Court erred in failing to specifically instruct that the jurors were required to agree unanimously upon which of the offenses defendant conspired to commit (Count 1); which scheme he engaged in to embezzle from the pension plans (Counts 2-12); and which unlawful activity was the predicate act for the money laundering charges or which type of money laundering method–promotion or concealment–he employed (Counts 13-54).

In deciding the § 2255 motion, the District Court concluded that it had in fact erred in its instructions to the jury as to the conspiracy count (Count 1), and that the error was not harmless because "the jury could have arrived at a non-unanimous verdict in violation of the Sixth Amendment." Nevertheless, the District Court denied Pelullo's request for collateral relief, concluding that he had not shown the requisite cause to properly raise the error for the first time on collateral attack.[29] Pelullo now appeals that decision, alleging that the

promote the carrying on of the specified unlawful activity, or knowledge that the financial transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity.

[29] The District Court further concluded that there was no risk of jury confusion and therefore no need for the unanimity charge as to Counts 2 through 54.

District Court's failure to provide a specific unanimity charge was constitutionally defective.

B.

The scope of our review is shaped by whether Pelullo procedurally defaulted on this issue, both at trial and on direct appeal. In *United States v. Frady*, the Supreme Court held that the proper standard of review for collateral attacks on trial errors, including jury instructions where no contemporaneous objection was made, is the "cause and actual prejudice" standard. 456 U.S. at 167. Under that standard, "to obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted defendant must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." *Id.* at 167-68. Applying *Frady* to the present case, the District Court concluded that, although Pelullo might have suffered actual prejudice from an erroneous jury instruction provided as to Count 1, he had failed to demonstrate "cause" for his procedural default at trial and again on direct appeal, thus defeating his claim for collateral relief.

Pelullo argues, however, that the "cause and actual prejudice" standard should not apply to his request for relief. He argues that his jury charge claims should be reviewed *de novo* because he effectively raised and preserved the issue at trial by requesting a specific unanimity charge. Alternatively, he contends that we should review his request under a plain error standard because he attempted to raise this issue on direct appeal. We address each contention below.

-52-

1.

Pelullo contends that he "raised this matter in the district court" because he submitted a proposed instruction that the jury must unanimously agree on which of the overt acts identified in Count 1 of the indictment (conspiracy) were committed. We disagree.

"A party generally may not assign error to a jury instruction if he fails to object before the jury retires or to 'stat[e] distinctly the matter to which that party objects and the grounds of the objection'." *Jones v. United States,* 527 U.S. 373, 387 (1999) (citation omitted). In *Jones*, the Supreme Court held that "a request for an instruction before the jury retires [does not] preserve an objection to the instruction actually given by the court," as "[s]uch a rule would contradict Rule 30's mandate that a party state distinctly his grounds for objection." *Id.* at 388; *see also United States v. Jake*, 281 F.3d 123, 131-32 (3d Cir. 2002). By merely requesting a specific unanimity charge, then, Pelullo did not properly object to the instructions. His reliance on a *de novo* standard of review is thus unavailing.

2.

Rule 52(b) of the Federal Rules of Criminal Procedure grants the courts of appeals the latitude to correct particularly egregious errors on appeal regardless of a defendant's trial default. Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."); *see also United States v. Turcks*, 41 F.3d 893, 897 (3d Cir. 1994). However, the plain

error standard is "out of place when a prisoner launches a collateral attack against a criminal conviction after society's legitimate interest in the finality of the judgment has been perfected by the expiration of the time allowed for direct review or by the affirmance of the conviction on appeal." *Frady*, 456 U.S. at 164.

Here, there is no dispute that Pelullo failed to raise the jury charge issue in his opening brief on direct appeal. What the parties do dispute is the efficacy of Pelullo's attempt to challenge the charges on direct appeal by way of supplemental brief to the Court. Pelullo's argument that *Frady* should not apply, insofar as it carries any validity, is based on one premise–that the government defeated his attempt to raise the issue on direct appeal.

When Pelullo moved to file a supplemental brief, the government opposed the motion, stating, in pertinent part:

> If this Court denies appellant's attempt to improperly add additional claims to this appeal, and appellant ultimately does not prevail in this appeal, he will not be precluded from raising these claims in a petition for relief under 28 U.S.C. § 2255 which, given the length of appellant's sentence, will inevitably follow this appeal.

This Court subsequently denied Pelullo's motion to supplement his appeal without explanation. Based on the foregoing history, Pelullo contends that the government should have been

judicially estopped from relying upon this purported procedural default.

We find Pelullo's attempt to blame the government for his double procedural default unconvincing. As an initial matter, he provides no explanation for failing to raise this matter before the jury retired. He also provides no explanation for his failure to timely raise this claim on direct appeal. Pelullo filed a sixty-page Brief for Appellant, which raised eight points with twenty-seven subparts. None of those points or subparts raised his present challenge to the unanimity instructions. After the government had filed its Brief for Appellee, Pelullo filed a motion with this Court, seeking permission to file a supplemental brief to complain for the first time about the absence of a specific unanimity instruction.

It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal. *In re Surrick*, 338 F.3d 224, 237 (3d Cir. 2003) (claim that was omitted from appellant's initial brief and raised for first time in a reply brief was waived); *see also Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993) (noting "that under Federal Rule of Appellate Procedure 28(a)(3) and (5) and Third Circuit Local Appellate Rule 28.1(a) appellants are required to set forth the issues raised on appeal and to present an argument in support of those issues in their opening brief"). Thus, the government's representation notwithstanding, this Court, absent exceptional circumstances, will not normally permit an appellant

to file a supplemental brief.[30]

By blaming the government for his procedural default, Pelullo not only ignores his failure to raise the issue both at trial and in his opening brief on direct appeal but also assumes that this Court denied his motion to file a supplemental brief based on the government's representation. However, the order denying Pelullo's motion is silent as to the reasons for that denial. The premise, therefore, that the government misled this Court is based on nothing but conjecture. This is particularly so in light of the independent and sufficient ground for denying the motion, to wit, the well-established rule that the failure to identify or argue an issue in an opening brief constitutes waiver of that issue on appeal. *See In re Surrick*, 338 F.3d at 237.

For this reason, moreover, Pelullo's invocation of judicial estoppel is unavailing. In *New Hampshire v. Maine*, 532 U.S. 742 (2001), the Supreme Court noted that:

> several factors typically inform the decision whether to apply that doctrine in a particular case:

---

[30] In his Motion for Leave to File Supplemental Brief, Pelullo argued that the complexity of the case, with its voluminous record and myriad factual and legal questions, was the reason why the jury charge issue was not previously identified (in his opening brief). No other reason was offered, and though this Court did not articulate its reasons for denying that motion, Pelullo's proffered justification was less than compelling.

First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* at 750-51 (internal quotations and citations omitted). Inasmuch as Pelullo cannot show that this Court accepted the government's representation in denying his motion to file a supplemental brief, there is "no risk of inconsistent court determinations" and "little threat to judicial integrity." *Id.* at 751; *see also Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 778 (3d Cir. 2001) ( "Judicial estoppel's sole valid use . . . is to remedy an affront to the court's integrity."). Thus, an integral factor justifying the application of judicial estoppel is clearly absent. *See Bulger*, 243 F.3d at 778 (holding that judicial estoppel is not appropriate where "the initial claim was never accepted or adopted by a court or

agency").[31]

Accordingly, we reject Pelullo's attempt to insulate his collateral attack on the jury charges from the strictures of *Frady,* and we hold that the proper standard of review is the "cause and actual prejudice" test.

## C.

Having determined that the proper standard of review for Pelullo's motion is the "cause and actual prejudice" test enunciated in *Frady*, the question becomes whether the District Court correctly applied this dual standard in dismissing Pelullo's petition.

Under the first prong of the *Frady* test, a defendant must show cause existed for the double procedural default, *i.e*. failure to raise the issue at trial and on appeal. To establish "cause" for procedural default, a defendant must show that "'some objective factor external to the defense impeded counsel's efforts' to raise the claim." *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)); *see also Wise v. Fulcomer*, 958 F.2d 30, 34 (3d Cir. 1992). "Examples

---

[31] In addition, it is not entirely clear that the government's positions are necessarily inconsistent. Pelullo could in fact raise his objection to the jury charges in a § 2255 motion, as the government indicated, though he then faced, in *Frady*, a significantly higher hurdle than would exist on direct appeal.

of external impediments which have been found to constitute cause in the procedural default context include 'interference by officials,' 'a showing that the factual or legal basis for a claim was not reasonably available to counsel,' and 'ineffective assistance of counsel.'" *Wise*, 958 F.2d at 34 n.9 (quoting *McCleskey*, 499 U.S. at 494).

Here, Pelullo offers no excuse for his failure to raise this issue at trial or in his opening brief on direct appeal. His sole contention is that cause exists for his failure to raise the issue on direct appeal based on the government's representation in opposing his motion to file a supplemental brief. This contention is insufficient for the reasons set forth above. As such, the District Court correctly determined that Pelullo failed to establish cause for his double procedural default.

Because Pelullo failed to establish the requisite cause excusing procedural default, it is unnecessary to determine whether Pelullo has shown actual prejudice. *See United States v. Griffin*, 765 F.2d 677, 682 (7th Cir. 1985).

## D.

The District Court properly dismissed Pelullo's § 2255 petition pursuant to *United States v. Frady,* 456 U.S. 152. We will therefore affirm the District Court's denial of relief under 28 U.S.C. § 2255.

## VII.

For the foregoing reasons, we will reverse the District

Court's grant of a new trial, and we will direct the District Court to reinstate Pelullo's judgment of conviction and sentence. We will also affirm the District Court's denial of collateral relief. In addition, we will remand the matter to the District Court for resolution of the remaining issues raised in Pelullo's § 2255 motion, and direct that the District Court, as a priority matter, give serious consideration to vacating its Order of January 29, 2002, which had released Pelullo on bail.