**PEOPLE OF THE VIRGIN ISLANDS, Plaintiff**

**v.**

**JAHLIL J. WARD (D.O.B. 10/22/87), Defendant**

Criminal No. F264/2008

Superior Court of the Virgin Islands

Division of St. Thomas and St. John

May 26, 2011

221

222

223

CLAUDE E. WALKER, ESQ., COURTNEY P. REESE, ESQ., Assistant Attorney
Generals, Virgin Islands Department of Justice, St. Thomas, USVI,
*Attorneys for the Plaintiff.*

MICHAEL C. QUINN, ESQ., ASHLEE GRAY, ESQ., Dudley Topper &
Feuerzeig, LLP, St. Thomas, USVI, *Attorneys for the Defendant.*

HOLLAR, *Judge*

## MEMORANDUM OPINION

(May 26, 2011)

## I. INTRODUCTION

Since 2008, the prosecution in this case has either suppressed or failed
to timely disclose *Brady/Giglio*[1] evidence. Undaunted by the granting of
two (2) new trials, this unabated conduct has persisted. Recently, *the
Court* has uncovered additional *Brady* evidence. Significantly, this
evidence is "material," prejudicial, intentionally withheld and yet to be
disclosed by the prosecution. The issue therefore to be resolved is whether
the pattern of recurring violations by the prosecution warrants this Court
to exercise its supervisory/inherent powers and impose a remedy in

---

[1] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *Giglio v. United
States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

addition to or in lieu of a new trial to deter the People's unabated transgressions?[2]

## II. BACKGROUND AND PROCEDURAL POSTURE

On August 11, 2010, in the aftermath of the Court's Order granting Defendant Jahlil Ward a third trial, the Court ordered the parties to respond to a set of inquiries specifically addressing the People's historic encounters with Glanville Frazer,[3] and the consequences of selective prosecution and prosecutorial misconduct.[4] The People submitted their responses to Defendant Ward's motion to dismiss and the Court's September 1, 2010 inquiries. Confounded by those responses, the Court issued another set of inquiries to the parties on December 10, 2010, seeking advisement on the applicable authority for an outright dismissal of · the case and in the alternative, the severest sanction that can be imposed in the face of unabated *Brady*[5] violations.[6]

Unsatisfied by the People's responses, the Court sought, *sua sponte*, to clarify the host of remaining issues. In doing so, the Court was disturbed and appalled by the number of *Brady/Giglio* violations that were detected in the past, *Brady* violations that had recently been indentified, as well as *Brady* violations that have not apparently been disclosed to the defense by the prosecution.

Prior to the Court's Order dated July 23, 2010, granting a second trial, the Court addressed the following:

- **September 12, 2007 — *Brady* Violation: The People's failure to disclose the statement of Daryl G. Martens, which implicated Kamal Thomas as James Cockayne's murderer.** On September 12, 2007, the People listed Daryl G. Martens as its key witness

---

[2] *United States v. Morrison*, 449 U.S. 361, 365, 101 S. Ct. 665, 66 L. Ed. 2d 564 (citations omitted) (1981). (*See also Government of the Virgin Islands v. Fahie*, 419 F.3d 249, 253 (2005).

[3] Glanville Frazer was called as a prosecution witness in both trials of *People v. Ward*. Mr. Frazer was also a witness in the related and consolidated cases of *People v. Jahwada Jones* and *People v. Lawrence Powell*, Case No. ST-09-CR-218 and Case No. ST-09-CR-219, respectively.

[4] *See* Court's Order dated August 11, 2010.

[5] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

[6] *See* Court's Order dated December 10, 2010.

against Defendant Kamal Thomas in the matter styled and docketed *People of the Virgin Islands v. Kamal Thomas* (ST-07-CR-0000298) because Martens, in his statement to law enforcement, claimed that Defendant Thomas, while detained at the Virgin Islands Bureau of Corrections, confessed to the murder of James P. Cockayne. Despite Defendant Ward's repeated demands for *Brady* evidence during discovery, the People withheld Martens' statement until approximately four months *after* Defendant Ward's conviction in his first trial in October 2008. The People's excuse that this non-disclosure was inadvertent was disingenuous, at best, considering the fact that the prosecution obviously intended to use Martens' statement as evidence against Defendant Thomas[7] *prior* to Defendant's Ward's arrest. Although subpoenaed as a prosecution witness, the People deliberately refrained from calling Martens as its witness during the matter *People of the Virgin Islands v. Kamal Thomas* to substantiate the murder charge against Defendant Thomas. Accordingly, in its Memorandum Opinion dated August 5, 2009, the Court ruled that this *Brady* evidence was both material *and* exculpatory as Defendant Ward had "no meaningful opportunity to utilize this crucial evidence" in his defense and such non-disclosure, intentional or not, was a *Brady* violation. Hence, a new trial was warranted.[8]

- **October 6, 2008 — *Brady/Giglio* Violation: The People's *de facto* grant of immunity to Glanville Frazer in exchange for his testimony during the first trial of *People v. Ward*.** On September 18, 2008, Glanville Frazer was subpoenaed to appear in Court beginning October 8, 2008, to give testimony in the consolidated cases of *People v. Boston, People v. Thomas*, and *People v. Ward*. Glanville Frazer's testimony was utilized in both trials against Defendant Ward. Thus, the People were undeniably aware that Frazer's testimony[9] constituted admission to two major felonies, to

---

[7] *See People v. Kamal Thomas*, Case No. ST-09-CR-298, where Defendant Kamal Thomas was originally charged with the murder of James P. Cockayne but was later acquitted on the homicide count.

[8] *See* Court's Memorandum Opinion dated August 5, 2009 at 22-23.

[9] Frazer testified that Defendant Ward allegedly came to his home on the night of the murder, confessed to the crime, and requested Frazer drive him from the area and scene of the crime.

wit: accessory-after-the-fact and misprision of a felon. Moreover, Frazer's testimony that he drove Defendant Ward from the immediate vicinity of the alleged crime scene constituted an acknowledgement that he violated the terms of his probation since his driver's license was suspended for two years as a result of his conviction on drug charges. Yet, there is no documentation evidencing that any law enforcement officer(s) and/or prosecutor(s) ever advised Frazer of his rights prior to eliciting his statement or testimony. Furthermore, if Frazer's testimony is to be believed, there is no record of the People's grant of immunity to him in exchange for his "assistance" in this case.[10] To date, Frazer has never been charged or prosecuted for his confessed criminal participation in connection with this matter. To add insult to injury, Frazer is immunized from prosecution for his transgressions because the statute of limitations has run on those felonies. Hence, the Court can only deduce from the record, along with the conspicuous but deafening silence on this issue, that the People clandestinely granted Frazer *de facto* immunity — a privilege not disclosed to Defendant Ward. In the Court's Memorandum Opinion dated July 23, 2010, the Court, *inter alia*, sanctioned this questionable practice by the People, ruling it a *Brady/Giglio* violation and granting Defendant Ward a new trial.

- **October 6, 2008 — *Brady/Giglio* Violation: The People's *de facto* grant of immunity to Jo'Nique Clendinen in exchange for her testimony during the first trial of *People v. Ward*.** On September 18, 2008, Jo'Nique Clendinen was also subpoenaed to appear in Court beginning October 8, 2008, to give testimony in the consolidated cases of *People v. Boston, People v. Thomas*, and *People v. Ward*. Clendinen, Glanville Frazer's live-in companion and a prosecution witness in both trials, claimed to be present at Frazer's home when she allegedly overheard Defendant Ward admit to a violent crime. Per her testimony, Clendinen subsequently authorized Glanville Frazer to use her car to drive Defendant Ward away from the scene of the crime on the night James P. Cockayne

---

Frazer admitted to driving Defendant Ward a substantial distance away from the area where the crime was alleged to have been committed.

[10] *See* Court's Memorandum Opinion dated July 23, 2010 at 22.

was murdered.[11] (Like Frazer, Clendinen was not advised of her rights prior to her testimony, which, if believed, would have subjected her to prosecution for aiding and abetting two major felonies, to wit: accessory-after-the-fact and misprision of a felon.[12]) The record is also devoid of any agreement between the prosecution and Clendinen concerning immunity in exchange for her testimony. And so, the Court must likewise conclude that the People granted Jo'Nique Clendinen *de facto* immunity, an unethical practice engaged in by the People, which was addressed in the Court's Memorandum Opinion dated July 23, 2010.[13]

- **January 19, 2009 — *Brady* Violation: The non-disclosure of the People's plea for leniency for Glanville Frazier.** In the first and second trial of *People v. Ward*, respectively held in October 2008 and December 2009, the prosecution called Glanville Frazer as its key witness. On February 9, 2006, Frazer pled guilty to possession of a controlled substance[14] and was sentenced to, *inter alia*: (1) one year incarceration, all suspended; (2) three years supervised probation; (3) submission to no less than four random drug tests per year, and if any one test was returned with a positive (+) result, the suspended jail term would be vacated and the defendant would be remanded to the Bureau of Corrections; and (4) two year suspension of defendant's driver's license.[15] Frazer was subsequently summoned, on more than one occasion, to appear before this Court for hearings regarding revocation of his probation. Specifically, the Office of Probation sought to have Frazer's probation revoked due to his inability to pass random drug testing as a result of his continued

---

[11] *Id.* at 26.

[12] *Id.* at 27.

[13] Because Frazer's probation violations were not disclosed, the defense was unable to cross-examine Clendinen on her knowledge of Frazer's probationary terms and whether she was aware of her contributions to his violation of those terms.

[14] *See People v. Glanville Frazer*, Case No. ST-05-CR-354. The Information charged the Defendant with Count I, Possession with Intent to Distribute a Controlled Substance, in violation of 19 V.I.C § 604(a), and Count II, Possession of a Controlled Substance, in violation of 19 V.I.C. § 607(a). The Defendant pled guilty to Count II and Count I was dismissed.

[15] *See* Judgment and Commitment issued by the Court on January 8, 2007, *nunc pro tunc*, February 9, 2006.

illegal use of cocaine and marijuana.[16] At his probation revocation hearing on January 19, 2009, Assistant Attorney General Douglas Dick, then Acting Chief of the Criminal Division, pleaded with the Court to be "lenient" with Frazer because he was a key government witness in *People v. Ward*.[17] The incessant appeals by Attorney Dick for the Court to consider options "preferable to putting [Glanville Frazer] in the Bureau of Corrections" because he was "very helpful to [the prosecution] in a serious case" **was never disclosed** to counsel for Defendant Ward.[18] Thus, Defendant Ward was unable to use this *Brady* evidence in his defense *during his second trial*. Because this non-disclosure was a *Brady* violation, the Defendant was granted a third trial.[19]

- **August 7, 2009 — *Brady* Evidence Disclosed: The People's untimely disclosure of payments made to Daryl G. Martens in connection with his testimony.** On August 7, 2009, two days after the Court granted Defendant Ward a new trial due to *Brady* violations, the People filed an informative motion containing additional discovery. Per the motion and unbeknownst to the prosecution, Daryl Martens, a key prosecution witness, had received expense money from the Cockayne family for his testimony.[20] While the prosecution may have been "left out of the loop," Dr. Iris Kern,[21] an employee of the V.I. Department of Justice, "conspired" with members of the Cockayne family to "keep [the pay offs] on the down low."[22] This is evidenced in several emails that were exchanged between

---

[16] *See People v. Glanville Frazer*, Case No. ST-05-CR-354. Letter from Dionne M. Simmonds, Probation Officer, dated October 21, 2008, advising the Court that Mr. Frazer tested positive (+) for marijuana.

[17] *See* Court's Memorandum Opinion dated July 23, 2010 at 23-26.

[18] *Id.*

[19] The Court also found other *Brady* violations with respect to the People's non-prosecution of two witnesses, Glanville Frazer and Jo'Nique Clendinen, who testified to having committed crimes in relation to this matter.

[20] *See* Court's Memorandum Opinion dated July 23, 2010 at 4. This money exchange could not have been a reward because Daryl Martens never testified nor was Defendant Kamal Thomas convicted of murder or any homicide.

[21] At the time this information was uncovered, Dr. Iris Kern was the Special Assistant to the Attorney General.

[22] *See* Court's Memorandum Opinion dated July 23, 2010 at 14. The Court addressed this *Brady* evidence during an evidentiary hearing on September 4, 2009, however, it did not

Dr. Kern, members of the Cockayne family and/or their counsel.[23] Martens was reportedly paid $1,000 for his intended testimony. In addition, the Cockaynes paid bills and/or expenses for Martens' rental car(s) and hotel(s).[24]

- **August 21, 2009 — *Brady* Evidence Disclosed: The People's untimely disclosure of payments made to Kenneth Rawlins and Aaron Ferguson in connection with their testimony**. On August 21, 2009, the People filed a motion for an evidentiary hearing. The motion revealed that upon the prosecution's investigation into the Daryl Martens payments, it discovered that other witnesses also received payments from the Cockayne family, to wit: Kenneth Rawlins and Aaron Ferguson.[25] Specifically, Kenneth Rawlins was paid $5,000 for his testimony in the first trial.[26] Aaron Ferguson also received $5,000 for his testimony as well as a substantial sum of money for the retention of private counsel and court attire.[27] Although counsel for the People asserted ignorance regarding the aforesaid financial agreements and/or payoff transactions, the record reflects that Dr. Iris Kern, an employee of the Department of Justice, was previously employed with one of the witnesses and arguably single-handedly facilitated that witness' "reward" payment unbeknownst to the prosecution.[28]

Having already addressed and sanctioned the prosecution's aforementioned misconduct in two separate Memorandum Opinions, the Court, much to its chagrin and consternation, has been advised of

make an official ruling on whether this untimely disclosure was a *Brady* violation because it gave Defendant Ward the "green light" to present evidence concerning the pay-off transactions between the Cockayne family and certain government witnesses. The defense strategically elected not to use this evidence. (*See* Demand for Notice of Alibi Supplemental Discovery and Reciprocal Demand dated September 3, 2009 disclosing November 13, 2008 and November 14, 2008 emails between Mrs. Jeanie Cockayne and Dr. Iris Kern).

[23] *Id.*

[24] Although Martens received payment for his intended testimony, he has never testified in any of the proceedings mentioned in this Memorandum Opinion.

[25] *See* Court's Memorandum Opinion dated July 23, 2010 at 4.

[26] *Id.* at 5, fn. 7.

[27] *Id.* (The record reflects that Ferguson received approximately $750.00 for court attire.)

[28] *See* People's Demand for Notice of Alibi Supplemental Discovery and Reciprocal Discovery submitted to the Court on September 1, and September 3, 2009.

additional *Brady* violations, since its *second* Order issued on July 23, 2010, granting a *third trial* in this matter. Those violations include:

- **May 5, 2009 — *Brady* Violation: The People's non-disclosure and failure to inform the defense of the strikingly similar facts and circumstances in *People of the Virgin Islands v. Jahlil Ward* and the consolidated cases of *People of the Virgin Islands v. Jahwada Jones and People of the Virgin Islands v. Lawrence Powell* where Glanville Frazer was the prosecution's central witness in both cases.** On May 5, 2009, Glanville Frazer gave a statement to law enforcement officers identifying Jahwada Jones and Lawrence Powell as the criminal assailants in another matter. In its Order dated January 20, 2011, this Court inquired as to "whether there was any common witness in the Jahlil Ward and Jahwada Jones cases" to which the People named Mr. Glanville Frazer.[29] Prior to the Court's inquiry, the People had not acknowledged, revealed, or disclosed to the defense that Glanville Frazer was a common witness in the two cases; both of which involved intoxicated, non-resident, Caucasian victims on the island of St. John that were brutally assaulted by allegedly multiple Black assailants. Both victims were also apparently seeking to purchase drugs from "locals" on St. John. Notwithstanding the foregoing, the People had the temerity to categorically deny that Glanville Frazer's presence in the latter prosecution (*Jones/Powell* case) had any impeachment and/or exculpatory value to the defense.[30]

- **January 24, 2011 — *Brady* Violation: The People's non-disclosure and failure to inform the defense that Glanville Frazer, the People's witness, was declared a hostile witness, recanted his testimony, and willfully misidentified the assailants in the *Jones/Powell* case.** On January 24, 2011, Glanville Frazer was called as a key prosecution eye witness in the *Jones/Powell* case. In a prior statement to law enforcement, Frazer named Defendants Jones and Powell as the victim's assailants. At trial, however, Frazer recanted his prior statement in open court and named Ariel Powell, a person who died shortly after the offense occurred in-

---

[29] *See* Inquiry #22 of the Court's Order dated January 20, 2011.

[30] *See* Government's Response to Defendant's Motion to Dismiss dated April 5, 2011.

volving Defendants Jones and Powell, as the true assailant in the *Jones/Powell* case.[31] Due to Frazer's conflicting statements and uncooperative attitude towards the prosecution, the People moved the Court to declare him a hostile witness.[32] This motion was granted. While Douglas Sprotte, Esq., Assistant Attorney General, the prosecutor in the *Jones/Powell* case, is undoubtedly aware of the aforesaid incidents and occurrences regarding Frazer, no disclosure of such has been made to date.

- **February 28, 2011 — *Brady* Violation: The People's non-disclosure and disingenuous denial of the similarity in circumstances in the case, *sub judice*, and in *People v. Jahwada Jones* and *People v. Lawrence Powell* cases.** In its Order dated January 20, 2011, the Court directed the People to respond in writing to a set of inquiries. In those inquiries the Court alluded to possible *Brady* evidence based on remarkably similar facts present in this matter and the *Jones/Powell* case.[33] Surprisingly, the prosecution, in its responses to the Court's inquiries, dealt short shrift and vaguely with the obvious *Brady* violations. Moreover, the prosecution denied that this matter and the *Jones/Powell* case were relevant to each other even though the victims' profiles, key prosecution witness and *modus operandi* of the assailant(s) are essentially identical.

Addressing defense counsel's repeated requests for dismissals of this action, this Court must consider the totality of the People's past *Brady/Giglio* violations, the *Brady* violations that were recently discovered, and the possibility of additional *Brady* violations yet to be disclosed. When granting a prior new trial for Defendant Ward, this Court had to craft and fashion remedies to cure the People's prior *Brady/Giglio* violations. Unfortunately, the prosecution has "struck again" in its mischief by committing additional *Brady* violations. To make a bad situation worse, the prosecution apparently has not yet disclosed the violations to the defense. Therefore, the Court must analyze whether dismissal of the case *sub judice* is now the only appropriate sanction to impose for the prosecution's unabated misconduct.

---

[31] *Id. at* 197-202.

[32] *Id. at* 202-03.

[33] *See People v. Jones*, Case No. ST-09-CR-218; *People v. Powell*, Case No. ST-09-CR-219.

## III. ANALYSIS

The issue to be resolved by this Court is whether the prosecution's recent intentional and prejudicial withholding(s) of "material" *Brady* evidence *after* the Court's Memorandum Opinion dated July 23, 2010 and accompanying Order of even date warrants the severest sanction of dismissal.

### BRADY VIOLATIONS

■ In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is 'material' either to guilt or to punishment irrespective of the good or bad faith of the prosecution."[34] Under *Brady*, the prosecution is required to provide the defense with not only exculpatory evidence but also impeachment evidence.[35] Impeachment evidence therefore falls within the ambit of the *Brady* rule.[36] In order to establish a *Brady* violation, a defendant must show: **(1)** evidence was suppressed; **(2)** the suppressed evidence was favorable to the defense; and **(3)** the suppressed evidence was "material" either to guilt or punishment.[37] Because this is an objective test, bad-faith is not required.[38]

■ In determining whether the prosecution suppressed evidence, a Court must first find that the prosecution possessed the evidence.[39] There is no question that the prosecution's duty to disclose under *Brady* reaches *beyond* evidence of an individual prosecutor's actual possession.[40] Since *Giglio v. United States*, the Supreme Court has made clear that prosecutors have "a duty to learn of any favorable evidence known to the

---

[34] *Brady*, 373 U.S. at 87. (*See also Maynard v. Government of the Virgin Islands*, 51 V.I. 744, 757 (D.V.I. 2009)).

[35] *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). (*See also Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972)).

[36] *Bagley*, 473 U.S. at 676 (citations omitted).

[37] *United States v. Pelullo*, 399 F.3d 197, 209 (3d Cir. 2005) (internal quotation marks and citations omitted), *cert. denied*, 546 U.S. 1137, 126 S. Ct. 1141, 163 L. Ed. 2d 999 (2006). (*See also United States v. Mitchell*, 365 F.3d 215, 254 (3d Cir. 2004)).

[38] *United States v. Merlino*, 349 F.3d 144, 154 (3d Cir. 2003).

[39] *United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006).

[40] *Id.* at 303.

others acting on the government's behalf in the case, including the police."[41] As a result, a prosecutor is obligated to disclose evidence within his/her "constructive possession" once the evidence falls within the tenets of *Brady*.[42] Under the theory of "constructive possession," actual knowledge is not required if a prosecutor should have known that the material and/or evidence at issue was in existence, even if developed in another case. *United States v. Joseph*, 996 F.2d 36, 39, 28 V.I. 438 (3d Cir. 1993).

In *United States v. Perdomo*,[43] the court found a *Brady* violation where defense counsel submitted requests for the criminal background of prosecution witnesses, and the prosecution failed to check local Virgin Islands records.[44] The fact that a computer check was done at the National Crime Information Center ("N.C.I.C") that failed to uncover local information was considered insufficient since the prosecution was deemed to have "constructive possession" of the local, unsearched, records.[45] Accordingly, the prosecution's failure to disclose criminal background information constituted a suppression of exculpatory evidence.[46]

Similarly, in *United States v. Thornton*,[47] the prosecutors were charged with "constructive" knowledge of DEA payments to government witnesses although they did not have "actual" knowledge of the payments[48] since "prosecutors have an obligation to make a thorough inquiry of all enforcement agencies that ha[ve] a potential connection with the[ir] witnesses."[49]

█ Notwithstanding *Perdomo* and its progeny, limitations have been set on the theory of "constructive" knowledge in the *Brady* context.[50] For

---

[41] *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).

[42] *Id.*

[43] *United States v. Perdomo*, 929 F.2d 967, 970 (3d Cir. 1991).

[44] *Id.*

[45] *Id.*

[46] *Id.* at 970.

[47] *United States v. Thornton*, 1 F.3d 149 (3d Cir. 1993).

[48] *Id.*

[49] *Thornton*, 1 F.3d at 158 (finding that, though there was a duty to disclose, materiality was lacking because the witnesses were not critical to the trial).

[50] *Risha*, 445 F.3d at 304.

example, in *United States v. Pelullo*[51] the issue presented was whether officials from the Pension and Welfare Benefits Administration ("PWBA") who possessed relevant documents should be considered members of the "prosecution team."[52] The *Pelullo* Court held that there Was no "constructive knowledge" because there was no reason to believe that the PWBA was acting on behalf of the prosecution.[53] There was no indication that the PWBA and the prosecution were "engaged in a joint investigation" or that they "otherwise shared labor and resources."[54] Instead, PWBA investigators played no role in the criminal case.[55] According to *Pelullo*, prosecutors are not required to undertake a "fishing expedition" in other jurisdictions to discover impeachment evidence.[56] Furthermore, prosecutors are not obligated to learn of all information "possessed by other government agencies that have no involvement in the investigation or prosecution at issue."[57]

In light of the foregoing, courts of appeals oftentimes consider additional factors when addressing the issue of constructive knowledge, including: (1) whether the party with knowledge of the information is acting on the government's "behalf" or is under its "control"; (2) the extent to which state and federal governments are part of a "team," are participating in a "joint investigation" or are sharing resources; and (3) whether the entity charged with constructive possession has "ready access" to the evidence.[58]

Given the impetus of *Brady's* first prong, courts cannot ignore two (2) branches of the doctrine.[59] The first branch holds that the government is not obligated "to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself."[60] According to the second branch, "defense counsel's knowledge of, and access to,

---

[51] *United States v. Pelullo*, 399 F.3d 197, 209 (3d Cir. 2005).

[52] *Pelullo*, 399 F.3d at 218.

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Risha*, 445 F.3d at 304.

[57] *United States v. Merlino*, 349 F.3d 144, 154 (3d Cir. 2003).

[58] *Risha*, 445 F.3d at 304.

[59] *Maynard*, 51 V.I. at 764-65 (D.V.I. 2009). (*See also Pelullo*, 399 F.3d at 213).

[60] *Pelullo*, 399 F.3d at 213.

evidence may be effectively nullified when a prosecutor misleads the defense into believing the evidence will not be favorable to the defendant."[61] Because these two branches of *Brady* jurisprudence arguably intersect, courts have reconciled the branches by weighing the prosecution's nonproduction and/or nondisclosure against three (3) factors: (1) the documents were voluminous and belonged to the defendant; (2) the government "lacked specific knowledge about the existence of favorable, material evidence"; and (3) the defendant had "extended access to, and purported knowledge of, particular documents."[62] When considering the second factor, however, a court should acknowledge that *Brady* evidence may be imputed between two attorneys working for the same sovereign in the same office.[63]

■ Lastly, the second and third prongs of *Brady*, require a defendant to establish that "the suppressed evidence was favorable to the defense . . . and . . . 'material' either [as] to guilt or punishment."[64] Evidence is "material" if there is a reasonable probability that, had the evidence been disclosed to the defense, the result would have been different.[65] Hence, the question is not whether disclosure would have resulted in a different verdict, but whether suppression of the evidence "undermine[s] confidence in the outcome of the trial."[66]

### GIGLIO VIOLATIONS

■ In *Giglio v. United States*, the Supreme Court held that when the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within *Brady*.[67] The Supreme Court noted, however, that a new trial will not necessarily follow whenever "a combing of the prosecutors' files after [a] trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. . . ."[68] This is because *Brady* requires a

---

[61] *Id.* at 213.
[62] *Id.*
[63] *Maynard*, 51 V.I. at 765 (D.V.I. 2009).
[64] *Pelullo*, 399 F.3d at 209.
[65] *Bagley*, 473 U.S. at 684.
[66] *Whitley*, 514 U.S. at 434-35.
[67] *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).
[68] *United States v. Keogh*, 391 F.2d 138, 148 (2d Cir. 1968).

showing of materiality.[69] A new trial is therefore required if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury. . . ."[70] Accordingly, *Giglio* held that impeachment evidence falls within the rule expressed in *Brady*.[71]

 The *Giglio* rule also encompasses instances where a prosecutor fails to disclose formal and/or informal promises or deals made to and/or with a witness.[72] Specifically, the Supreme Court has held that if a prosecutor promised a witness that he/she would not be prosecuted if he/she cooperated with the government, such a promise was attributable to the government, regardless of whether the prosecutor had authority to make the promise, and nondisclosure of such a promise would constitute a violation of due process requiring a new trial.[73] Many other courts have therefore endorsed a broader reading of *Giglio*, finding that a "promise, reward or inducement" exists whenever an informal representation about future leniency is made to a cooperating witness, even if it falls far short of an explicit offer.[74] Informal understandings, arrangements "imperfect in . . . clarity," and implications of future benefit falling short of "an outright promise" have all been recognized as falling within the *Giglio* rule.[75]

 Examples of such informal inducements to a cooperating witness that have been considered subject to mandatory disclosure include a statement to an accomplice that "everything would be all right" if he cooperated; a statement by a detective that "he would use his influence with the Commonwealth attorney" to see that the accomplice was not prosecuted; a promise to a jailhouse informant that his "cooperation

---

[69] *Brady*, 373 U.S. at 87.

[70] *Naupe*, 360 U.S. at 271.

[71] *U.S. Wecht*, 484 F.3d 194, 207 (3d Cir. 2007).

[72] *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

[73] *Id.*

[74] *See People v. Diaz*, 297 Ill. App. 3d 362, 696 N.E.2d 819, 826, 231 Ill. Dec. 523 (1998) ("An agreement between the [s]tate and its witness does not have to be so specific that it satisfies the traditional requirements for an enforceable contract."). (*See also* Michael R. Cassidy, *"Soft Words of Hope:" Giglio, Accomplice Witnesses and the Problem of Implied Inducements*, 98 NW. U. L. REV. 1129, 1155-1156 (2004)).

[75] *See Owen v. State*, 265 Ga. 67, 453 S.E.2d 728, 730 (1985); *Commonwealth v. Hill*, 432 Mass. 704, 739 N.E.2d 670, 676 (2000); and *Burkhalter v. State*, 493 S.W.2d 214 (Tex. Crim. App. 1973). (*See also* Michael R. Cassidy, *"Soft Words of Hope:" Giglio, Accomplice Witnesses and the Problem of Implied Inducements*, 98 NW. U. L. REV. 1129, 1155-1156 (2004)).

would be made known" to the judge who revoked his probation; the stated willingness of a police officer to "write a letter to the [AG]" advising him of an accomplice's cooperation; and a commitment by the prosecutor to take the witness's assistance "into consideration" at the time of sentencing.[76] Courts have recognized that it is unrealistic to draw a line between an outright promise to do something (such as to reduce or dismiss charges) and a casual or nonspecific implication to do the very same thing.[77]

▆ Because a prosecutor's "soft words of hope," made contingent on that prosecutor's satisfaction with the witness's cooperation, may create a great incentive on the part of the witness to please the government, *Giglio* dictates that the constitutional requirement to disclose "material" evidence favorable to the defendant should not be limited to "formal, consummated, binding agreements."[78] Toward this end, the Massachusetts Supreme Judicial Court has recently admonished its prosecutors that "any communication that suggests preferential treatment to a key government witness in return for that witness's testimony is a matter that must be disclosed by the Commonwealth."[79] Simply put, the fact that the terms of an agreement are not clearly delineated does not insulate the arrangement from disclosure.[80]

---

[76] *See Campbell v. Reed*, 594 F.2d 4, 6 (4th Cir. 1979); *Boone v. Paderick*, 541 F.2d 447, 449 (4th Cir. 1976); *Patillo v. State*, 258 Ga. 255, 368 S.E.2d 493, 498 (1988), *cert. denied*, 488 U.S. 948, 109 S. Ct. 378, 102 L. Ed. 2d 367 (1988); *Smith v. State*, No. 02C01-9801-CR-00018, 1998 Tenn. Crim. App. LEXIS 1316, at *23 (Tenn. Crim. App. Dec. 28, 1998); *Commonwealth v. Hill*, 432 Mass. 704, 739 N.E.2d 670, 680 (2000); and *State v. Lindsey*, 621 So. 2d 618, 623 (La. Ct. App. 1993). (*See also* Michael R. Cassidy, "*Soft Words of Hope:*" *Giglio, Accomplice Witnesses and the Problem of Implied Inducements*, 98 NW. U. L. REV. 1129, 1155-1156(2004)).·

[77] *See Burkhalter v. State*, 493 S.W.2d 214, 217 (Tex. Crim. App. 1973). (*See also* Michael R. Cassidy, "*Soft Words of Hope:*" *Giglio, Accomplice Witnesses and the Problem of Implied Inducements*, 98 NW. U. L. REV. 1129, 1155-1156 (2004)).

[78] *See Campbell v. Reed*, 594 F.2d 4, 7-8 (4th Cir. 1979); *Lindsey*, 621 So. 2d at 624, 626. (*See also* Michael R. Cassidy, "*Soft Words of Hope:*" *Giglio, Accomplice Witnesses and the Problem of Implied Inducements*, 98 NW. U. L. REV. 1129, 1155-1156 (2004)).

[79] *See Hill*, 739 N.E.2d at 680 (emphasis added). (*See also* Michael R. Cassidy, "*Soft Words of Hope:*" *Giglio, Accomplice Witnesses and the Problem of Implied Inducements*, 98 NW. U. L. REV. 1129, 1155-1156 (2004)).

[80] *Id.*

This Court has already addressed and attempted to cure the People's prior *Brady/Giglio* violations in its Memorandum Opinions dated August 5, 2009 and July 23, 2010, respectively. Separate and apart from the People's past transgressions, however, are *new* (emphasis added) acts of misconduct that fall under the *Brady* doctrine. These newly surfaced *Brady* violations identified below, evidence the prosecution's unabated pattern of misconduct.

- Nondisclosure of Glanville Frazer being declared a "hostile" prosecution witness on January 24, 2011 in the consolidated cases styled and docketed *People v. Jahwada Jones* (ST-09-CR-0000218) and *People of the Virgin Islands v. Lawrence Powell* (ST-09-CR-0000219).[81]

- Nondisclosure of Glanville Frazer's admitted participation in the *Jones/Powell* case by "selling" drugs to the victim and subsequently "rifling though" the victim's wallet during the assault to retrieve payment for his (Frazer's) drugs.

- Nondisclosure of Glanville Frazer's conflicting statements regarding the "true" assailant(s) in the *Jones/Powell* case. Specifically, prior to trial, Frazer implicated Defendant Jahwada Jones and Defendant Lawrence Powell as the individuals who assaulted and robbed a Caucasian tourist (victim) in the aforesaid matters. During trial, however, Frazer recanted and implicated a deceased individual as the "true" assailant, to wit: Ariel Powell. Frazer's irrec-

---

[81] Although Glanville Frazer was a witness for the prosecution in the consolidated cases of *People of the Virgin Islands v. Jahwada Jones* (ST-09-CR-0000218) and *People of the Virgin Islands v. Lawrence Powell* (ST-09-CR-0000219), Glanville Frazer was declared a "hostile" witness in those matters. On January 24, 2011, the consolidated cases of *People of the Virgin Islands v. Jahwada Jones* (ST-09-CR-0000218) and *People of the Virgin Islands v. Lawrence Powell* (ST-09-CR-0000219) came on for jury trial, at which time, counsel for the People moved to have Glanville Frazer declared a "hostile" witness because, while on the witness stand, Frazer sought to recant prior statements that he gave to the prosecution. The Court granted the People's oral motion. (*See* Trial Transcript dated January 24, 2011 at pp. 202-203).

oncilable statements and participation in the *Jones/Powell* case are evident in the following trial colloquy:[82]

ATTORNEY SPROTTE: Let me start from the beginning. April 12, 2009, 12:30, 1:00 o'clock in the morning, do you recall where you were?

GLANVILLE FRAZER: If I recall where I was?

ATTORNEY SPROTTE: Yes.

GLANVILLE FRAZER: That was the night of the incident, right?

ATTORNEY SPROTTE: Yes.

GLANVILLE FRAZER: I just came down the road.

ATTORNEY SPROTTE: The road to where?

GLANVILLE FRAZER: Down by Duffy's, right there by Bayside, Bayside Minimart.

ATTORNEY SPROTTE: Is that in the area of Joe's?

GLANVILLE FRAZER: Yes, that's right across the street from Joe's.

ATTORNEY SPROTTE: So you were standing across the street from Joe's at that time?

GLANVILLE FRAZER: I wasn't standing across the road. I just came down the road to walk down the road.

ATTORNEY SPROTTE: All right. And on that day at that time and at that location, did you observe anything, unusual occurrence?

GLANVILLE FRAZER: Yes, I saw Ariel struggling with a white male.

ATTORNEY SPROTTE: Start from the beginning. Did you first see — when did you first see the white male?

GLANVILLE FRAZER: When I saw him talking to Ariel.

ATTORNEY SPROTTE: What did he look like?

GLANVILLE FRAZER: Caucasian, a tall Caucasian man.

ATTORNEY SPROTTE: Young, old?

GLANVILLE FRAZER: Kind of oldish looking.

ATTORNEY SPROTTE: Carrying anything in particular, unusual?

---

[82] Trial Transcript dated January 24, 2011 at pp. 194-198.

**GLANVILLE FRAZER:** I wasn't observing like that.

**ATTORNEY SPROTTE:** Did you speak to him?

**GLANVILLE FRAZER:** No.

**ATTORNEY SPROTTE:** So, you walked up —

**GLANVILLE FRAZER:** I walked up; I met Ariel. Ariel asked me for something. I was giving it to him to give the man. That's where he and the guy started struggling. He tried to reach in the man's pocket. He and the guy were struggling. That's when the wallet dropped on the ground. I took it up; it was empty. I dropped it back down on the ground, and I left. That was it.

**ATTORNEY SPROTTE:** That was Ariel?

**GLANVILLE FRAZER:** Yes.

**ATTORNEY SPROTTE:** Where is Ariel now?

**GLANVILLE FRAZER:** You asking me? You going ask me where is Ariel. You supposed to know where he's at.

**ATTORNEY SPROTTE:** I'm asking you if you know where he's at.

**GLANVILLE FRAZER:** He's deceased.

**ATTORNEY SPROTTE:** Thank you.

**THE COURT:** All right, sir. Just try and answer the questions.

**GLANVILLE FRAZER:** Yes, Your Honor.

**THE COURT:** Don't spar with counsel.

**GLANVILLE FRAZER:** Yes, Your Honor.

**ATTORNEY SPROTTE:** Do you recall discussing this same incident with Detective Vincent?

**GLANVILLE FRAZER:** On two different occasions. I made two different statements with her.

**ATTORNEY SPROTTE:** Let's talk about the first one.

**GLANVILLE FRAZER:** What about the second one?

**ATTORNEY SPROTTE:** Let's talk about the first one.

**GLANVILLE FRAZER:** Oh.

**ATTORNEY SPROTTE:** Is what you told us just now what you told her in your first statement?

**GLANVILLE FRAZER:** That was — Ariel had threatened me, so that's why I said what I said.

241

ATTORNEY SPROTTE: Is what you told her what you told us now? Yes or no.

GLANVILLE FRAZER: The second time or the first time?

ATTORNEY SPROTTE: The first time. Yes or no.

GLANVILLE FRAZER: If that's what I told who?

ATTORNEY SPROTTE: Yes or no.

GLANVILLE FRAZER: Rephrase the question.

ATTORNEY SPROTTE: I'd love to. Is what you told us today the same thing that you told Detective Vincent in your first statement?

GLANVILLE FRAZER: What I just told you?

ATTORNEY SPROTTE: Yes.

GLANVILLE FRAZER: No, I didn't because the guy threatened me.

ATTORNEY SPROTTE: Okay. So, it's a yes or no question. It was not the same thing?

GLANVILLE FRAZER: No.

This testimony of Glanville Frazer, if believed, is critical in Defendant Ward's new trial since Ariel Powell was alive at the time James P. Cockayne was murdered and Frazer admits that Ariel Powell threatened and forced him to "misidentify" innocent persons in order to deflect attention from his (Ariel Powell's) culpability.

 Because nondisclosure of evidence affecting the credibility of a given witness falls within the tenets of *Brady* when the reliability of that witness may be determinative of a defendant's guilt or innocence,[83] the prosecution's failure to notify Defendant Ward of Glanville Frazer's hostility and conflicting statements in the Jones/Powell case constitutes two (2) separate *Brady* violations. Glanville Frazer remains one of the People's key witnesses in the case *sub judice* and therefore the reliability of his testimony is arguably determinative of Defendant Ward's guilt or

---

[83] *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). (*See also Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972)).

innocence. Accordingly, any evidence affecting Glanville Frazer's credibility in the above styled matter is "material" *Brady* evidence and was required to be disclosed to the defense.

As illustrated from the transcript in the *Jones/Powell* case and despite being a witness for the People, Glanville Frazer assisted the defense by recanting previous statements implicating Defendant Jones and Defendant Powell. Significantly, Frazer recanted his original statement to law enforcement and conveniently implicated a deceased individual as the "true" assailant. To date, the prosecution has not disclosed this "material" information or the fact that Frazer was declared a "hostile" witness to Defendant Ward. Instead of divulging this critical information to defense counsel, the People disingenuously contend that notice is not warranted "because the cases are not relevant to each other."[84] Even more shocking and shameful, the prosecution has the "chutzpah" to categorically assert that no government witness in the *Jones/Powell* case made inconsistent statements regarding their involvement in that case.[85] The Court is particularly troubled by this fabricated assertion given Glanville Frazer's testimony during the *Jones/Powell* case. Consequently, the People's recent transgressions confirm that absent stern reproach and deterrence, the prosecution has no intention of or incentive to uphold its obligations and/or duties under *Brady*.

**ALTHOUGH THE COURT WILL RELUCTANTLY REFRAIN FROM INVOKING ITS INHERENT/SUPERVISORY POWERS TO DISMISS THE ABOVE STYLED MATTER WITH PREJUDICE AT THIS TIME, IT WILL IMPOSE A SANCTION ABOVE AND BEYOND THE GRANTING OF A NEW TRIAL IN ORDER TO DETER THE PEOPLE'S APPARENT LAWLESSNESS.**

Defendant Ward has moved the Court to dismiss the above styled matter with prejudice based on the People's past and present *Brady/Giglio* transgressions and argues that the prosecution's misconduct is "serial" in nature. Counsel for the People, without citing any law whatsoever to justify the prosecution's misconduct, responded to the defense's motion to dismiss in an emotionally charged but frivolous opposition.

■■ While the Third Circuit Court of Appeals and the U.S. Supreme Court have not yet decided when, if ever, dismissal with prejudice is a

---

[84] People's Response to the Court's Inquiry dated February 25, 2011 at p. 1.

[85] People's Response to the Court's Inquiry dated February 25, 2011 at p. 2.

proper response to a *Brady* violation, or if retrial and other like sanctions are the most severe remedy available, both Courts have left open the possibility of barring retrial in response to particularly egregious due process violations.[86] Generally speaking, however, the circuit Courts of Appeals remain split on the propriety of dismissal as a remedy for a *Brady* violation. *Some* Courts of Appeals have remarked or implied that no harsher sanction than a new trial is ever available to remedy a *Brady* violation[87] while others· have held or implied that dismissal may sometimes· be appropriate.[88]

█ Notably, in all jurisdictions, *dismissal with prejudice is a rare sanction for any constitutional violation.*[89] The Third Circuit has held that dismissal for a *Brady* violation may be appropriate in cases of deliberate misconduct because those cases call for penalties which are not only corrective but are also highly deterrent.[90] Deliberate misconduct is targeted for extra deterrence because willful misbehavior is most effectively deterred by enhanced penalties.[91] As a result, dismissal *may* be proper **where a defendant can show: (i) willful misconduct by the government; and (ii) prejudice.**[92]

In the case *sub judice*, the defense has kept an apt paper trail of the People's *Brady/Giglio* violations and the record is pellucid with respect to the People's *unabated* misconduct in this matter. Those violations have not only been willful, prejudicial and egregious but also "material" because there is a probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different and/or the

---

[86] *Fahie*, 419 F.3d at 252. (*See United States v. Russell*, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973) stating "[w]e may someday be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction."); (*See also United States v. Coleman*, 862 F.2d 455, 460 n.8 (3d Cir. 1988)).

[87] *See United States v. Mitchell*, 164 F.3d 626 (4th Cir. 1998) (unpublished table decision); *United States v. Davis*, 578 F.2d 277, 280 (10th Cir. 1978); *United States v. Evans*, 888 F.2d 891, 897 n.5, 281 U.S. App. D.C. 194 (D.C. Cir. 1989).

[88] *United States v. Lewis*, 368 F.3d 1102, 1107 (9th Cir. 2004); *United States v. Fletcher*, 801 F.2d 1222, 1225 (10th Cir. 1986).

[89] *Fahie*, 419 F.3d at 254.

[90] *Id.* at 254-255.

[91] *Id.* at 255. (*See Nat. Hockey League v. Met. Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S. Ct. 2778, 49 L. Ed. 2d 747 (1976)).

[92] *Id.* at 255.

suppression of the evidence "undermine[s] confidence in the outcome of the trial."[93] Moreover, Defendant Ward has undeniably suffered at the hands of the prosecution's contumacious conduct. *Ergo*, it therefore goes without saying that this case may be ripe for dismissal under *Fahie* and its progeny.

While dismissal may be warranted under *Fahie's* rationale, the Court will exercise extreme judicial constraint and reluctantly "stay its hand" from entering an Order of dismissal at this juncture. Before resorting to dismissing this matter with prejudice, the Court, however, will further sanction the prosecution above and beyond the granting of a new trial in order to deter the People's apparent lawlessness.[94] Accordingly, the People's sanction is two-fold. Firstly, counsel for the People will be barred from utilizing Glanville Frazer as a witness at trial in its case-in-chief or as a rebuttal witness. Secondly, counsel for the People will be barred from using Jo'Nique Clendenin as a witness in its case-in-chief or during rebuttal because of the *Brady* violations regarding her as well. If, however, the prosecution insists on proving to the Court that it is indeed "bent on mischief and commits one (1) more *Brady* or *Giglio* violation, the Court will, without hesitation, immediately dismiss this matter with prejudice!

## IV. CONCLUSION

██ Notwithstanding the People's willful, egregious and "material" *Brady* violations and the prejudice imposed upon Defendant Ward as a result of such misconduct, the Court will not invoke its inherent and/or supervisory powers and dismiss the above style matter because dismissal for a *Brady* violation is not mandatory under applicable case law, there remains a general prohibition against the dismissal of cases, and if full disclosure has finally been made to the defense, it is preferable that final disposition of this case be made through the jury system. Given the character and consequences of the People's misconduct, however, counsel

---

[93] *Maynard*, 51 V.I. at 770 (D.V.I. 2009).

[94] *Morrison*, 449 U.S. 361, 365, 101 S. Ct. 665, 66 L. Ed. 2d 564 (1981); *Fahie*, 419 F.3d 249, 253 (2005). (*See also United States v. Rosenfield*, 780 F.2d 10, 11 (3d Cir. 1985) and *United States v. Costanzo*, 740 F.2d 251, 257 (3d Cir. 1984) (stating that when fashioning an appropriate sanction, a court must take into account the particular character and consequences of the misconduct)).

for the People will be precluded at trial from utilizing either Glanville Frazer or Jo'Nique Clendenin as prosecution witnesses during the People's case-in-chief or any rebuttal.

Accordingly, Defendant Jahlil Ward's Motion to Dismiss Based on the People's Serial Violations of *Brady* and *Giglio* dated August 5, 2010 is **DENIED**.